10 A.3d 1203 (2011)
417 N.J. Super. 530
STATE of New Jersey, Plaintiff-Respondent,
v.
Omar TINDELL, Defendant-Appellant.
No. A-5457-07T4
Superior Court of New Jersey, Appellate Division.
Argued October 20, 2010.
Decided January 7, 2011.
*1207 Daniel V. Gautieri, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Mr. Gautieri, of counsel and on the brief).
Debra G. Simms, Assistant Prosecutor, argued the cause for respondent (Robert D. Laurino, Acting Essex County Prosecutor, attorney; Ms. Simms, of counsel and on the brief).
Before Judges FUENTES, GILROY and NUGENT.
The decision of the court was delivered by
FUENTES, J.A.D.
Defendant Omar Tindell[1] was indicted by an Essex County Grand Jury and charged with first degree conspiracy to commit murder, N.J.S.A. 2C:5-2, N.J.S.A. 2C:11-3a; first degree purposeful or knowing murder, N.J.S.A. 2C:11-3a (1) and (2); first degree attempted murder, N.J.S.A. 2C:5-1, N.J.S.A. 2C:11-3; second degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4a; third degree unlawful possession of a handgun, N.J.S.A. 2C:39-5b; third degree *1208 receiving stolen property, N.J.S.A. 2C:20-7; third degree possession of cocaine, N.J.S.A. 2C:35-10a(1); third degree endangering the welfare of children, N.J.S.A. 2C:24-2; and third degree terroristic threats, N.J.S.A. 2C:12-3a. Hassan Reeds was indicted as a codefendant and charged with committing the same offenses as Tindell, except for the charge of third degree terroristic threats.
Defendant and Reeds were tried together before the same jury. Reeds was convicted of third degree receiving stolen property and acquitted of all of the other charges.[2] The jury convicted defendant of second degree reckless manslaughter, N.J.S.A. 2C:11-4b(1), as a lesser included offense of murder, third degree receiving stolen property, third degree possession of cocaine, one count of third degree unlawful possession of a handgun, and one count of third degree terroristic threats. Defendant was acquitted of the remaining charges.
The court sentenced defendant to five consecutive maximum terms, with maximum periods of parole ineligibility. Specifically, the court sentenced defendant on the reckless manslaughter conviction to a term of ten years, with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2; a term of five years on the receiving stolen property conviction, with two and one-half years of parole ineligibility; a term of five years on the possession of a controlled dangerous substance conviction, with two and one-half years of parole ineligibility; a term of five years on the unlawful possession of a weapon conviction, with two and one-half years of parole ineligibility; and a term of five years on the terroristic threats conviction, with two and one-half years of parole ineligibility. This resulted in an aggregate sentence of thirty years with eighteen and one-half years of parole ineligibility.
After reviewing the record before us, we affirm defendant's convictions of second degree reckless manslaughter, third degree possession of cocaine, and third degree unlawful possession of a weapon, reverse and remand for a new trial the conviction of third degree terroristic threats, and vacate the conviction of third degree receiving stolen property and remand for the entry of a judgment of acquittal on that charge. We also vacate the sentence imposed by the court in its entirety and remand for re-sentencing before a different judge.
The following facts will inform our analysis of the legal issues presented on appeal.

I
The first link in the tragic chain of events that led to the death of a police officer was forged in the context of a seemingly banal event: an altercation between two teenaged girls who attended the same high school, one of whom is defendant's sister.
In the afternoon hours of July 18, 2005, unarmed School Security Officer Alice Thomas and armed plain-clothes Special Police Officer[3] Dwayne Reeves intervened *1209 to break up a fight between these two girls. The officers brought the girls to the principal's office, Reeves called for medical assistance, and both girls' parents were notified of the incident.
Shortly thereafter, the school principal and a number of school security officers and special police officers noticed a white Chrysler 300 driving up and down Chancellor Avenue, the street directly in front of the school's main entrance. Defendant was the driver of the car and Reeds was a passenger.
Tracy Whidbee was one of the school security officers present at the time. She testified that on at least one occasion she saw defendant exit the car and yell to a group of girls standing nearby: "which one of y'all jumped ... my sister[], if I find out who jumped my sister, they're going to be planning their funerals todaytonight."
Kevin Batty, the high school's assistant dean of discipline, was also present when defendant confronted a separate group of teenaged students who were standing near the school's athletic field. Batty testified that he heard defendant yell to this group of juveniles that the person who jumped his sister "would be going on a long vacation." According to Batty, as he escorted defendant away from the students he noticed that defendant appeared "angry."
Security Officer Kameleh Williams also interacted with defendant that day. She testified that after breaking up the altercation between the girls, she saw defendant drive the white Chrysler up to the school's main entrance. Defendant then walked up the "four stairs" leading to the school's main doorway and demanded to know "who touched [his] sister," because those who touched his sister "were going to die tonight." According to Williams, defendant referred to the school's principal as "a punk ass." With respect to Special Police Officer Akhia Scott, who was standing in the school's doorway, Williams testified that defendant stated "[f]uck that cop" and threatened to "shoot him, too" because defendant "didn't give a fuck."
Minutes before this interaction, defendant and Reeds had attempted to drive on Aldine Street toward the high school; when they reached a police barricade blocking the road, Reeds exited the car and removed the barricade. According to Police Officer Kenneth Irvin, when he told Reeds to replace the barricade, Reeds did not respond immediately; defendant, however, told Reeds to "[d]o what the officer says, give him his respect...." Reeds complied and replaced the barricade. The two men then proceeded to the school in a different direction.
Special Police Officer Reeves was in the principal's office when he received a radio report that defendant was threatening a group of students standing near the athletic field. After calling for back-up, Reeves, fellow Special Officer Scott, and Security Officer Thomas proceeded to the athletic field. Reeves and Scott were in one car; Thomas drove in a different car. When the three officers arrived, they saw a white Chrysler double-parked in the middle of the street near the field; defendant and Reeds were outside of the vehicle talking to the group of juveniles.
Reeves told Thomas to drive up the street and block the white car to prevent it from moving. Security Officer Dejauhitha *1210 Sabahtino, who was standing in an area where she could see and hear what was taking place, testified that she saw Reeves attempt to calm defendant down. Reeves asked defendant for identification and to produce documentation with respect to the vehicle, to which defendant responded, "I'm moving it now."
According to Scott, when Reeves touched defendant on the elbow and said "[l]et me talk to you for a minute," defendant pulled away and responded "don't put your fucking hands on me." This prompted an immediate physical response from Reeves resulting in the two men pushing each other. When Reeves attempted to subdue defendant to place him under arrest, defendant physically resisted and yelled out (presumably to Reeds), "Don't let him take me."
At this point in time, defendant was up on a brick ledge, behind which was a fence. Reeves had defendant up against the fence and was attempting to handcuff him, while defendant was attempting to climb the fence in order to frustrate Reeves' efforts. As this was taking place, Security Officer Thomas saw a handgun on defendant's waist. Thomas immediately informed Scott, who in turn responded to assist Reeves. Seconds later, Thomas heard two gun shots.
Two people without any connection to the event witnessed the shooting: Zenola Moncrease, who was driving in the area directly across the street from the scene, and Richard Ferguson, an on-duty bus driver. They testified that they saw defendant with a gun in his hand shoot Reeves in the head. According to Moncrease, Reeves dropped to the ground "like a piece of tissue." Scott was also shot in the hand.
Reeves died of a single gunshot wound to the neck. The bullet entered from the right side back of his neck, traveled in a downward direction, and exited at the left side of his chin, in the front of his face. There was no evidence of gun powder residue around the wound. Based on this evidence, the medical examiner testified that he could not determine the distance between Reeves and the shooter. However, the shirts worn by Reeves and Scott tested positive for gunshot residue, suggesting that a firearm had been discharged in close proximity.
Witnesses characterized what transpired immediately after the shooting as "chaos." Moncrease testified (without objection) that an unidentified girl became hysterical and kept repeating to defendant, "Why'd you shoot him? Why'd you have to do that? You didn't have to do that. Why'd you shoot him? You didn't have to do that."
Both defendant and Reeds ran from the scene immediately after the shooting. Scott was able to draw his weapon and shoot three times in defendant's direction, striking him once in the wrist. Defendant then continued running in a different direction than Reeds, taking clothes off as he ran. School security officers Whidbee, Williams, and Anthony Baskerville all testified that they saw defendant running with a gun in his hand.
Officer Irvin, who a few minutes before the shooting had encountered defendant and Reeds on Aldine Street, responded to the call of an "officer down." Irvin testified, again without objection from defense counsel, that "when [he] heard the call, [he] knew. [He] knew what happened. And [he] knew who did it." When he eventually arrived at the location of defendant's apprehension on Chancellor Avenue, near the corner of Aldine Street, and saw that defendant was not wearing a shirt and was bleeding from an apparent gunshot wound, Irvin testified that "[he] had no doubt about it. [He] knew."
Defendant was eventually transported to a hospital for treatment of his gunshot *1211 wound. Newark Police Officer Elmo Ruiz was assigned to guard defendant at the hospital. According to Ruiz, while waiting to be treated, defendant yelled, "Yeah, I did it. We [sic] going to get you all. We're going to kill you." Ruiz perceived this as a threat against him and his fellow officers.
Newark Police Officer Walter Melvin was also assigned to guard defendant. At one point Melvin was alone with defendant, with Ruiz within hearing distance. Melvin testified that defendant
was going into a tirade about how we, meaning the Newark police officers, had started a war, what he did today was just a beginning, it was going to be a massacre ... we don't know what we've started, you're not going to see the end of this, all ya'll going to get it, and this went on for maybe five minutes.
At the scene of the shooting the police took possession of a white Chrysler 300 with the engine running and music playing on the radio. The vehicle's steering column was not damaged, the key was in the ignition, and a temporary license plate sticker was pasted in the front window. The officers who searched the vehicle found a loaded, .40 caliber High Point semi-automatic pistol inside the car on the front passenger seat, leaning against the center console. They also found ten compact discs in the center console and vials of cocaine on the driver's side rear floor. Defendant's fingerprints were found on one of the compact discs.
At trial, the parties stipulated that neither defendant nor Reeds had a permit to possess a firearm at all times relevant to this matter. The parties also stipulated to the following facts concerning the white Chrysler:
Svetlana Kalantarov[4] was the registered owner on July 18, 2005, of a white 2005 300C Chrysler vehicle with the serial number 2C3AA63H65H170053. On June 23, 2005, Ms. Kalantarov reported the car stolen. Neither Hassan Reeds nor Omar Tindell had Ms. Kalantarov's permission to operate the vehicle.
We note, however, that the State did not present any evidence that the particular white Chrysler described in the stipulation was the car driven by either defendant or Reeds on the day of the shooting. Nor did the State call the victim of the alleged theft to confirm that the car seized at the scene of the shooting was the same car she had reported as stolen. Finally, neither defendant nor Reeds concedes that the vehicle described in the stipulation was the same vehicle they possessed or drove on the day of the shooting.
Both defendant and Reeds exercised their right to remain silent and did not testify in their own defense. Defendant called only one witness, Newark Police Officer Karama Thomas. Officer Thomas testified that she was with Special Police Officer Inspector Manuel Spruill at a daycare center located at 300 Chancellor Avenue when she heard gun shots. She immediately went to a nearby window and saw defendant running down the street.
Because Spruill was not armed, Thomas instructed him to get the patrol car while she began pursuing defendant on foot eastbound on Chancellor Avenue until defendant reached Aldine Street. According to Thomas, she never lost sight of defendant throughout her pursuit. She eventually caught up to defendant at Aldine Street, pointed her handgun at him, and ordered him to stop. It was at this point that she *1212 noticed that defendant had been shot. Thomas described defendant's demeanor as fully compliant.
At this time, Officer Irvin arrived at the scene with his handgun also pointed at defendant. Thomas directed Irvin to go to the location of the shooting because she had the situation secured. Thomas testified that defendant followed her instructions to sit on the curb until paramedics and other police officers arrived. According to Thomas, defendant kept "babbling about something about he didn't know that the officers were police officers." In contrast to the testimony presented by the State, Thomas testified that she did not see defendant carry or discard any handgun during the time she pursued him, up to and including the time when she apprehended him.

II
Against this evidential backdrop, defendant now appeals, raising the following arguments:
POINT I
ALTHOUGH THE PARTIES STIPULATED THAT A PARTICULAR WHITE CHRYSLER HAD BEEN STOLEN, THE STATE FAILED TO PROVE THAT THE WHITE CHRYSLER DRIVEN BY TINDELL WAS THAT VEHICLE, AND THAT TINDELL KNEW THAT THE VEHICLE HAD BEEN STOLEN.
A. The State Failed to Prove that Tindell was Driving Kalantarov's Stolen Chrysler.
B. The Trial Court Erred in Denying the Motion to Dismiss Count Seven Because the State Failed to Prove that Tindell Knew or Believed that the Vehicle he was Driving had Probably Been Stolen.
POINT II
THE JUDGE'S INSTRUCTION ON THE TERRORISTIC THREATS COUNT WAS DEFECTIVE AS IT FAILED TO IDENTIFY THE VICTIM, CREATING A DANGER OF A PATCHWORK VERDICT.
POINT III
THE TRIAL COURT ERRED IN FAILING TO SUA SPONTE CHARGE THE JURY ON JOYRIDING AS A LESSER-INCLUDED OFFENSE OF RECEIVING STOLEN PROPERTY. (Not Raised Below)
POINT IV
THE TRIAL COURT ERRED IN FAILING TO CONDUCT A SUFFICIENT INQUIRY AS TO WHETHER THE JURORS READ A PREJUDICIAL NEWSPAPER ARTICLE THAT WAS FOUND IN THE JURY ROOM AND FAILED TO TAKE SUFFICIENT STEPS TO ENSURE THAT JURORS WERE NOT INFLUENCED BY CONCERNS FOR THEIR PERSONAL SAFETY. (Partially Raised Below)
POINT V
DEFENDANT WAS DENIED DUE PROCESS WHEN OFFICER IRVIN TESTIFIED THAT HE "KNEW" DEFENDANT WAS RESPONSIBLE FOR THE SHOOTING, BECAUSE IT SUGGESTED THAT IRVIN HAD KNOWLEDGE OF EXTRA-RECORD INFORMATION ABOUT TINDELL THAT WAS UNFAVORABLE. (Not Raised Below)
POINT VI
TINDELL'S SENTENCE MUST BE VACATED BECAUSE THE JUDGE BELIEVED THE JURORS WERE COWARDS FOR NOT CONVICTING TINDELL OF MURDER, AND THE JUDGE IMPROPERLY IMPOSED FIVE CONSECUTIVE MAXIMUM SENTENCES TO PUNISH TINDELL AS IF HE HAD BEEN CONVICTED OF MURDER.
*1213 We agree with defendant as to Points I and II. On the charge of third degree receiving stolen property involving the white Chrysler 300, the State did not meet its burden of proving, beyond a reasonable doubt, that the vehicle described in the stipulation was the same vehicle that defendant or Reeds drove and jointly possessed at the time of the shooting. We are therefore bound to vacate the conviction for third degree receiving stolen property and remand for the entry of a judgment of acquittal on that charge. As a consequence, the argument in Point III is rendered moot.
The trial court's instructions to the jury on the charge of third degree terroristic threats failed to identify, with particularity, the victim[s] of defendant's alleged threats. We therefore reverse the conviction of third degree terroristic threats and remand for a new trial on that charge.
We disagree with defendant, however, as to Point IV. The record shows that the trial judge took adequate prophylactic measures to avoid any improper influences from reaching the jurors. The judge also carefully and thoroughly investigated each reported incident of alleged impropriety and took corrective action where warranted. We also reject defendant's argument as expressed in Point V. Although Officer Irvin's statements are facially troubling, in the context of this case these statements do not rise to the level of a manifest injustice under the plain error standard of review. R. 2:10-2.
Finally, we agree with defendant's argument as expressed in Point VI. The sentence imposed by the court is legally unsustainable. The record does not support the imposition of five consecutive sentences leading to an aggregate term of thirty years, with eighteen and one-half years without parole. The statements made by the trial judge during the sentencing hearing created an irreparable impression of bias and antipathy toward defendant. We are thus compelled to remand this matter for re-sentencing before a different judge.
We will now discuss each of these issues in greater detail.

A

Receiving Stolen Property
In count seven of Indictment XXXX-X-XXXX, the State charged defendant and Reeds with third degree receiving stolen property. The indictment read as follows:
OMAR TINDELL AKA TUTT
HASSAN REEDS
on the 18th day of July, 2005 in the City of Newark in the County of Essex aforesaid and within the jurisdiction of this Court, did commit theft by knowingly receiving movable property, a 2005 Chrysler automobile, known to be stolen from Svetlana Kalantrov
contrary to the provisions of N.J.S.A. 2C:20-7, a crime of the third degree, and against the peace of this State, the government and dignity of the same.
The State's case against defendant on this charge was based in part on a stipulation entered into by the parties that: (1) on July 18, 2005, Svetlana Kalantarov was the registered owner of a white 2005 300C Chrysler with the serial number 2C3AA63H65H170053; (2) Kalantarov reported the vehicle stolen on June 23, 2005; and (3) neither defendant nor Reeds had Kalantarov's permission to operate the vehicle.
The State also called a number of witnesses who testified that, on July 18, 2005, they observed defendant and Reeds drive a white Chrysler model 300, and at other times each occupy the car as a *1214 passenger.[5] The white Chrysler seen in the possession of defendant and Reeds was taken into custody by the police on the day of the incident. This vehicle did not have any damage to the steering column or any other signs of tampering; a key was in the car's ignition, and a temporary license plate sticker was affixed to the front window. The State did not introduce any evidence at trial regarding the serial number of this vehicle or call Kalantarov to testify that the car recovered by the police was the same car she had reported as stolen.
On this record, defendant moved at the conclusion of the State's case for a judgment of acquittal on the charge of third degree receiving stolen property in connection with the white Chrysler recovered by the police. Defense counsel argued that defendant could not have known the vehicle in his possession was stolen because there was a key in the ignition and a temporary license sticker in the window. The court denied the motion, finding sufficient grounds to submit this issue to the jury. Based on the record before us, we are satisfied that the State did not present sufficient evidence to establish defendant's guilt on this charge as a matter of law.
To sustain a criminal conviction, the State must prove all of the elements of a criminal charge beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072-73, 25 L.Ed.2d 368, 375 (1970); State v. Hill, 199 N.J. 545, 558-59, 974 A.2d 403 (2009). This burden is not only a constitutional mandate, but is also codified in N.J.S.A. 2C:1-13(a).
Motions for a judgment of acquittal are governed by Rule 3:18-1, which provides:
At the close of the State's case or after the evidence of all parties has been closed, the court shall, on defendant's motion or its own initiative, order the entry of a judgment of acquittal of one or more offenses charged in the indictment or accusation if the evidence is insufficient to warrant a conviction.
Rule 3:18-2 provides:
If the jury returns a verdict of guilty... a motion for judgment of acquittal may be made, even if not earlier made pursuant to R. 3:18-1 or it may be renewed within 10 days after the jury is discharged or within such further time as the court fixes during the 10-day period. The court on such motion may set aside a verdict of guilty and order the entry of a judgment of acquittal....
The standard for resolving a motion brought under either rule is the same.
On a motion for judgment of acquittal, the governing test is: whether the evidence viewed in its entirety, and giving the State the benefit of all of its favorable testimony and all of the favorable inferences which can reasonably be drawn therefrom, is such that a jury could properly find beyond a reasonable doubt that the defendant was guilty of the crime charged.
[State v. D.A., 191 N.J. 158, 163, 923 A.2d 217 (2007), citing State v. Reyes, 50 N.J. 454, 458-59, 236 A.2d 385 (1967).]
No distinction is made between direct and circumstantial evidence. State v. Mayberry, 52 N.J. 413, 437, 245 A.2d 481 (1968), cert. denied, 393 U.S. 1043, 89 S.Ct. 673, 21 L.Ed.2d 593 (1969); Reyes, supra, 50 N.J. at 458-59, 236 A.2d 385. Inferences need not be established beyond a reasonable doubt. State v. Taccetta, 301 N.J.Super. 227, 240, 693 A.2d 1229 (App. Div.), certif. denied, 152 N.J. 188, 704 A.2d 18 (1997). We apply the same standards used by the trial court in its determination of defendant's motion for a judgment of *1215 acquittal. State v. Moffa, 42 N.J. 258, 263, 200 A.2d 108 (1964).
With these standards in mind, we turn our attention to the specific elements of the charge against defendant. A person is guilty of receiving stolen property "if he knowingly receives or brings into this State movable property of another knowing that it has been stolen, or believing that it is probably stolen." N.J.S.A. 2C:20-7(a). The crime of receiving stolen property thus has three elements: (1) defendant knowingly[6] received movable property of another; (2) the property was stolen; and (3) defendant either knew the property had been stolen or believed it had probably been stolen at the time he received it. State v. Hodde, 181 N.J. 375, 384-85, 858 A.2d 1126 (2004).
Here, viewing the evidence in the light most favorable to the State, including all inferences reasonably drawn therefrom, there is no evidence from which to establish that the car in defendant's possession was the same car reported stolen by Kalantarov. The fact that Kalantarov's car was a white Chrysler model 300C and defendant and Reeds were seen driving a similar car does not, in and of itself, establish that these were the same vehicle. The stipulation entered into by the parties did not address this element of the crime.
The State had the burden to present at trial competent evidence establishing that the vehicle seen in defendant's possession was stolen. This could have been easily accomplished by introducing evidence that the vehicle identification number from the car recovered by the police at the scene matched the identification number of Kalantarov's car. Alternatively, Kalantarov could have testified that the vehicle recovered by the police was the same car she had reported stolen.
The State argues that the jury could have inferred that defendant resisted arrest after he was unable to produce the credentials requested by Officer Reeves because he knew the car was stolen. This argument does not address the issue at hand. Before the jury can consider defendant's state of mind, there must be evidence that the car in his possession was in fact stolen. The State failed to present any evidence to meet this threshold burden.[7] We are therefore compelled to remand this matter for the trial court to enter a judgment of acquittal on the conviction of third degree receiving stolen property.

B

Terroristic Threats
Defendant argues that his conviction for terroristic threats must be reversed because the court's instructions to the jury on this charge did not sufficiently identify the alleged victims, referring instead only to "persons at or near ... [the] High School." We agree. Defendant's alleged threats were directed at multiple victims, including high school girls and school security officers who were standing in close proximity to each other. The court's jury charge did not identify by name the intended victims of the threats. This left the door open for a patchwork verdict, with the clear possibility that jurors *1216 did not reach unanimity on all elements of the charge.
Count eleven in Indictment XXXX-X-XXXX against defendant reads as follows:
on the 18th day of July, 2005 in the City of Newark in the County of Essex aforesaid and within the jurisdiction of this Court, did threaten to commit a crime of violence against persons with the purpose of terrorizing said individuals contrary to the provisions of N.J.S. 2C:12-3a, a crime of the Third Degree and against the peace of this State, the government and dignity of the same.
[(Emphasis added).]
At the conclusion of the State's case, defendant moved for judgment of acquittal as to this count on the grounds that the victims were not specified in the indictment, and there was insufficient proof in the record to sustain the charge. The court initially reserved decision, but ultimately denied the motion.
At the charge conference held pursuant to Rule 1:8-7(b), defense counsel objected to the proposed jury instructions as to terroristic threats, arguing that the instructions did not adequately specify the victims of the terroristic threats. The court rejected counsel's argument and instructed the jury as follows:
Count 11 alleges that defendant Omar Tindell, also known as Tutt, "on the 18th day of July, 2005, in the city of Newark, in the county of Essex, within the jurisdiction of this Court, did threaten to commit a crime of violence against persons with the purpose of terrorizing said individuals in violation of New Jersey law."
And that law reads in pertinent part as follows: "A person is guilty of a crime if he threatens to commit any crime of violence with the purpose to terrorize another or in reckless disregard of the risk of causing such terror."
In order to convict defendant on this charge, the State must prove the following elements beyond a reasonable doubt: One, that the defendant threatened to commit a crime of violence; two, that the threat was made with the purpose to terrorize another or in reckless disregard of the risk of causing such terror.
So the first element the State must prove beyond a reasonable doubt is that defendant threatened to commit any crime of violence. The State alleges that defendant threatened to commit the violent crime of murder.
The words or actions of the defendant must be of such a nature as to convey menace or fear of a crime of violence to the ordinary person.
It's not a violation of this statute if the threat expresses fleeting anger or was made merely to alarm.
The second element the State must prove beyond a reasonable doubt is that the threat was made with the purpose to terrorize another or in reckless disregard of the risk of causing such terror.

In this case, the State alleges that defendant intended to terrorize ... persons at or near ... [the] High School as to count 11. The State need not prove that the victim actually was terrorized.
[(Emphasis added).]
Although the court also instructed the jury on the need to reach unanimous verdicts on each charge, it did not issue a specific unanimity instruction with respect to terroristic threats. In his summation, the prosecutor referred to the various threats defendant allegedly made, but did not specifically identify a victim or victims with respect to the specific charge of terroristic threats.
It is well-settled that "[a]ppropriate and proper charges to a jury are essential for a fair trial." State v. Green, 86 *1217 N.J. 281, 287, 430 A.2d 914 (1981). They are most critical in criminal cases "when a person's liberty is at stake." Id. at 289, 430 A.2d 914. Because proper jury instructions are an indispensable part of a fair trial, "erroneous instructions on matters or issues material to the jury's deliberations are presumed to be reversible error." State v. Collier, 90 N.J. 117, 122-23, 447 A.2d 168 (1982); State v. Eldridge, 388 N.J.Super. 485, 496, 909 A.2d 736 (App.Div.2006), certif. denied, 189 N.J. 650, 917 A.2d 789 (2007).
Referring only to the section of the statute that is relevant here, N.J.S.A. 2C:12-3(a) defines the third degree offense of terroristic threats as follows:
A person is guilty of a crime of the third degree if he threatens to commit any crime of violence with the purpose to terrorize another or to cause evacuation of a building, place of assembly, or facility of public transportation, or otherwise to cause serious public inconvenience, or in reckless disregard of the risk of causing such terror or inconvenience.
To sustain a conviction for this offense, the State must prove, beyond a reasonable doubt, that defendant: (1) threatened to commit a crime of violence; and (2) he intended to terrorize the victim, or acted in reckless disregard of the risk of doing so. State v. Conklin, 394 N.J.Super. 408, 410-11, 927 A.2d 142 (App.Div.2007). The communication must be of such a character that a reasonable person would have believed the threat. State v. Dispoto, 189 N.J. 108, 121, 913 A.2d 791 (2007).
We have not found, and the parties have not cited any reported cases addressing whether the victim of the intended threat under N.J.S.A. 2C:12-3(a) must be identified by name in the indictment and in the court's charge to the jury.[8] We are satisfied, however, that the elements of the crime of terroristic threats implicitly require the identification of the intended victim. Without knowing the identity of the victim, the statutory phrase "with the purpose to terrorize another" is rendered devoid of substance.
The facts of this case illustrate the problem. Defendant is charged with allegedly making a number of threats against a diverse group of individuals, including the girl involved in the altercation with defendant's sister, Officer Scott, and the children and school personnel outside the high school. Under these circumstances, the door is left open for the following or a similar scenario to occur: six jurors could have found that defendant threatened only the girl who attacked his sister; the remaining six jurors could have found that defendant threatened only Officer Scott; and none of the jurors could have found that defendant threatened the other children or school personnel.
The verdict just described is legally unsustainable because it lacks the unanimous agreement of all twelve jurors. Unfortunately, the instructions given to the jury here created this possibility by referring only to "persons at or near [the] High School." Without identifying in some fashion the victim of the threat, the jury is left unacceptably vulnerable to reaching a fragmented verdict, leaving us unable to verify that a crime has been committed.
Although not a definitively authoritative source, the Model Jury Charge approved *1218 by the Supreme Court as to N.J.S.A. 2C:12-3(a) supports this conclusion. It provides, in pertinent part:
In order to convict defendant of the charge, the State must prove the following elements beyond a reasonable doubt:
1. That the defendant threatened to commit a crime of violence.
2. That the threat was made with the purpose to ...
terrorize another or in reckless disregard of the risk of causing such terror
....
The second element that the State must prove beyond a reasonable doubt is that the threat was made with the purpose to...
terrorize another or in reckless disregard of the risk of causing such terror. In this case, the State alleges that defendant intended to terrorize (name of victim). The State need not prove that the victim actually was terrorized.... [Model Jury Charge (Criminal), "Terroristic Threats" (N.J.S.A. 2C:12-3(a)) (2004) (emphasis added).]
We recognize that under subsection (a) in N.J.S.A. 2C:12-3, a person may be convicted of the third degree offense of terroristic threats by one of two ways: if he or she threatens to commit any crime of violence with the purpose to: (1) "terrorize another;" or (2) "cause [the] evacuation of a building, place of assembly, or facility of public transportation, or otherwise to cause serious public inconvenience, or in reckless disregard of the risk of causing such terror or inconvenience." Ibid.
In the first instance, the State must identify the victim in some fashion, either by name or by such characteristics that would enable a reasonable person to ascertain who was the target of the threat. The jury cannot be left to speculate as to the identity of the victim. The State must prove all elements of the crime, including identifying the victim or victims whom defendant intended to terrorize. In re Winship, supra, 397 U.S. at 364, 90 S.Ct. at 1073, 25 L.Ed.2d at 375.
In the second instance, involving the evacuation of a building or place of assembly, etc., the victims include the persons directly displaced by a defendant's actions, as well as society as a whole, through the needless expenditure of public resources to achieve an orderly and safe evacuation of the affected sites.
Verdicts in criminal cases must be unanimous. U.S. Const. amends. VI, XIV; N.J. Const. art. 1, ¶ 9; R. 1:8-9; State v. Gandhi, 201 N.J. 161, 192-93, 989 A.2d 256 (2010); R. 1:8-9. General charges on unanimity are insufficient where there is the risk of jury confusion or a fragmented verdict. Gandhi, supra, 201 N.J. at 193, 989 A.2d 256; see also, State v. Parker, 124 N.J. 628, 635-37, 592 A.2d 228 (1991), cert. denied, 503 U.S. 939, 112 S.Ct. 1483, 117 L.Ed.2d 625 (1992).
The risk of a non-unanimous verdict occurs if, as here, there are multiple alleged victims who are not separately identified in the charging instrument, by name or by such other characteristics as to enable a reasonable person to ascertain their identity as the victims of the crime, and are not specifically identified as such in the jury charge and on the verdict sheet. Here, the nature of the alleged threats and the circumstances surrounding them required that the victims be identified with particularity. Without such specificity, there is a distinct and legally unacceptable risk that a jury may return a verdict that was not based on the unanimous judgment of the deliberating jurors.
We reached similar conclusions in two reported decisions addressing analogous situations. In State v. Bzura, 261 N.J. Super. 602, 612-15, 619 A.2d 647 (App.Div. 1993), we addressed a unanimity issue that *1219 arose when it was unclear whether the jury had convicted the defendant under N.J.S.A. 2C:28-2(a), "by making a specific false statement or set of statements," or N.J.S.A. 2C:28-2(c), "by making two inconsistent statements or set of statements, one or the other of which was false and not believed by defendant to be true." Both the indictment and the jury charge were unclear on the issue. Ibid. As such, this court found that
some jurors could have found that the two sets of statements made by defendant were not "inconsistent" with each other, but that one of the statements within one of the sets of statements was false and not believed by defendant to be true, and that defendant therefore was guilty of false swearing. In that event, the jury could have returned a guilty verdict without all its members agreeing either that any two statements or sets of statements were inconsistent with each other or that any particular statement was false. In other words, the jury instruction would have permitted some jurors to vote for a guilty verdict based on the form of false swearing proscribed by N.J.S.A. 2C:28-2a, by finding that one of defendant's six statements was false, while permitting other jurors to find N.J.S.A. 2C:28-2c, by finding the kind of inconsistency between the two sets of statements which establishes that one of the two sets of statements was false and believed by defendant to be false. To permit individual jurors to agree on a guilty verdict based on such different factual predicates would countenance a non-unanimous jury verdict....
[Id. at 614-15, 619 A.2d 647.]
In this context, we reversed the defendant's conviction based upon the risk that the jury returned a non-unanimous verdict. Id. at 615, 619 A.2d 647.
Similarly, in State v. Jackson, 326 N.J.Super. 276, 279, 741 A.2d 128 (App. Div.1999), we held that
the State's proofs did not establish a prima facie case of possession of the cocaine found in the dresser drawer in the room where defendant was sleeping, although it did establish a prima facie case as to the cocaine found in the pants pocket. Thus, ... the jury should then have been instructed to disregard the evidence respecting the cocaine found in the dresser drawer.
We reversed the conviction because of the insufficiency of the jury charge on this issue. Writing for the panel in Jackson, Judge Arnold explained:
Because the charge to the jury did not distinguish between the cocaine found in the dresser drawer and the cocaine found in the pants, it is possible that some of the jurors convicted defendant based only on possession of cocaine found in the dresser drawer. Thus the jury's required unanimity was compromised.
[Id. at 282, 741 A.2d 128.]
Finally, we distinguish our Supreme Court's recent decision in Gandhi, supra, 201 N.J. at 191, 989 A.2d 256, rejecting the defendant's unanimity argument. In Gandhi, the defendant claimed "that the verdict to support elevation of the stalking conviction to the third degree could not have been unanimous because the verdict sheet did not require the jury to specify that it reached unanimous agreement as to which particular no-contact order justified elevation of each of defendant's convictions." Ibid. Neither the indictment nor the jury verdict sheet identified the no-contact order that the defendant was alleged to have violated. Id. at 192, 989 A.2d 256.
The Court rejected the defendant's argument, however, because it had been *1220 made by amicus, with defendant joining in the argument only after oral argument before the Supreme Court, and because the defendant did not request a specific unanimity instruction pertaining to the no-contact orders. Id. at 192-93, 989 A.2d 256. Moreover, "[b]ecause each [no-contact order] was related to previous orders, with no break in time when defendant was not subject to a no-contact order during the period charged in the offenses, there was no risk of a fragmented verdict based on contradictory findings." Id. at 193, 989 A.2d 256. The Court also found no basis in the record to conclude that the jury might have been confused about the orders being relied upon by the State. Id. at 193-95, 989 A.2d 256.
By contrast here, defendant raised the issue at trial and there were multiple distinct threats made against multiple distinct individuals. Despite these facts, neither the jury charge nor the verdict sheet required the jurors to reach unanimity on which threat warranted a conviction.
We therefore reverse defendant's conviction on third degree terroristic threats and remand the matter for a new trial on this charge.

C

Juror Bias
Defendant argues that he was denied a fair trial because the trial judge failed to conduct a sufficient inquiry into whether jurors had read a newspaper article found in the jury room. Defendant also maintains that the judge failed to take sufficient steps to ensure that jurors were not influenced by concerns for their personal safety. We disagree.
Defendant and Reeds were tried for one of the most serious charges any person can facetaking the life of a police officer engaged in the performance of his duty. The concerns ordinarily associated with such a case were made more acute by the specter of defendant's alleged association with the Bloods, a notorious violent street gang known to operate in the Essex County area. The record shows that the trial judge was keenly aware of these concerns and consequently took special care to preserve the integrity of the trial.
In particular, the trial judge gave special attention to the issues of publicity and courtroom security. Because this case did not involve in any way defendant's alleged gang affiliation, the judge directed counsel to ensure that witnesses not testify about this subject matter. With regard to the jury, the judge questioned all prospective jurors about their exposure to any pretrial publicity regarding the case. He also regularly instructed jurors to avoid conversations, news coverage, and any publicity concerning the case, and emphasized that it was the jurors' obligation to decide the case based solely upon the evidence presented in court.
The judge ordered special security measures concerning access to the courtroom. Essex County Sheriff's Officers searched, registered, and conducted record checks on all persons entering the courtroom; no cell phones or cameras were permitted in the courtroom; and additional officers were strategically deployed throughout the courtroom area. The judge instructed the press not to photograph jurors and allayed any potential concerns by the jurors about this issue by informing them of this directive. This directive at times applied even to witnesses. When two witnesses, outside the presence of the jury, asked that their photographs not be taken for fear of possible retaliation, the judge directed the photographers present to honor their request.
Despite these prophylactic measures, an incident occurred on the fifth day of trial that tested the trial judge's resolve to ensure the integrity of the proceedings. On *1221 this day, the prosecutor advised the court that a photograph of one of the witnesses had been published in the newspaper. The photograph was then placed on telephone poles with language indicating that the witness should keep her mouth shut. According to the prosecutor, the witness had also received threatening telephone calls. The prosecutor asked the court to instruct the press photographers covering the trial not to photograph lay witnesses. Defense counsel did not object to this request.
The next day, the Star Ledger published an article titled "Judge in Cop Killing Trial Told of Threat to Witnesses." The article addressed the threatening telephone calls the witness had allegedly received and mentioned that her photograph had been posted on telephone poles. The article also reported that two other witnesses had asked that they not be photographed. The article's author referred to defendant as "reputedly an enforcer for the 9 Tre Gangsters, which authorities describe as a violent faction of the Bloods gang." The article further stated that "[w]itness intimidation has been an ongoing problem in murder trials in Essex County and other inner-city areas, especially in gang-related cases."
Reeds' defense counsel addressed the court on this issue outside the presence of the jury and before testimony began. He asked that the court remind jurors not to read anything about the case reported in the press, "and just ask, generally make sure that everyone has complied with that prior instruction of the Court." Reeds' counsel asked the court to address this issue without highlighting or otherwise drawing attention to the article itself. Defendant's counsel concurred.
The court acceded to defense counsel's request and admonished the jury accordingly. Thereafter, the judge asked "if there's anyone who has not followed that instruction, please raise your hand, and I'd like to talk to you about it with counsel. Is there anyone who has not followed that instruction?" None of the jurors raised their hands.
Later that day, defendant's counsel brought to the court's attention that a newspaper had been found in the jury room.[9] In response, the court agreed to inquire as to whether any jurors had read anything about the case in that day's newspaper. The prosecutor also asked the court to instruct the jurors not to bring newspapers to court. Reeds' counsel asked the court to direct the jurors not to read the Star Ledger throughout the entire course of the trial.
Thereafter, the court addressed the jurors as follows:
Ladies and Gentlemen, again, I gave you instructions numerous times and you were handed a piece of paper not to read any news accounts about this case in the paper. There was a Star Ledger found in the jury room. You're instructed not to bring newspapers to court.
Did anyone read the article in the Star Ledger that was in the jury room, about today's  about the trial?
(Whereupon the jurors shaking heads.)
THE COURT: Did anyone read that article at all? Okay. I see no hands.
*1222 The trial thereafter continued without any objection from defense counsel.
The following day, the trial judge reported to counsel that a juror, or jurors, believed that they were photographed in the hallway by a woman holding a cellphone camera. The judge indicated that these jurors expressed "some concern" about the incident to a Sheriff's Officer. After questioning the woman with the cellphone, the judge determined that she was a relative of a defendant in a case scheduled to be heard by the court later that day. No pictures were found on her cellphone camera. The woman also claimed to have been merely looking at messages at the time of this incident with the jurors.
Based on these facts, the court directed a Sheriff's Officer to reassure the jurors that the woman with the cellphone was "no one connected with the case" and that her cellphone did not have any "photographic images."
Despite these measures, the judge indicated that certain jurors had
express[ed] concern to [the Sheriff's Officer] about the fact that there were a lot of individuals roaming in the hallway outside our courtroom, that they felt that the officer, officers in the hallway were not really paying attention to what was going on and, in the words of my officer, they appeared to be jittery.
In an abundance of caution, and as a means of allaying the jurors' concerns, the court decided to enhance the security measures already in place. Working in concert with the ranking Sheriff's Officer assigned to the trial, the judge directed that the jurors "report to a different floor and that they be brought up en masse for each day's court events and that they also be escorted during lunch breaks, et cetera."
Defendant's counsel also requested that the jurors be questioned, "either individually or as a group" concerning "whether this incident or what's gone on up to this point ... has impacted any of them in any way in connection with their abilities to be fair and impartial in this case," and whether the new restrictions imposed for their safety would preclude them from being "fair and impartial from this point forward." The prosecutor thought such an approach was not necessary, and Reeds' counsel believed that the court should address the jurors in a less formal manner.
The court agreed with Reeds' counsel, finding it unnecessary to voir dire the jurors, either individually or en masse. The judge believed, however, that it was necessary
to talk to them and let them know what the investigation has revealed and indicat[e] to them that there will be, since they've expressed some concern, that there will be some additional measures that we're going to take to alleviate their concerns.
The court thereafter addressed the jurors as follows:
All right, Ladies and Gentlemen, first thing, before we take any additional testimony this morning, I've been advised of concerns that you've had this morning with regard to a cell phone that maybe one or more of you believed had been used to take a photograph of you. As you know, I've prohibited any cameras, media individuals from taking any photographs of the jurors in this case, and that obviously is a concern of mine.
Based upon the investigation that was conducted, the individual with the cell phone was apprehended and questioned; the cell phone was confiscated.
Based upon that investigation that was done, I can assure you that the individual had no connection to this case whatsoever. I have some matters on my calendar today that are totally unrelated to this case, and the individual who *1223 was here was a relative of one of those defendants. So the investigation has shown that the individual had no connection to this case.
The investigation has also shown that there were no photographs that were taken on the cell phone, that the individual had the cell phone raised up, but no photographs were taken.
Nevertheless, if you're concerned, then I'm concerned, and to alleviate your concerns, we'll be taking some additional measures that should alleviate some of your concerns.
So after today, when you do report, we'll have you all meet on a different floor, and you'll be brought in to court with a Sheriff's officer or more, and during your lunch recess we'll make sure that you're accompanied by a Sheriff's officer, and we'll also make sure that you're accompanied outside the courthouse at the end of the day.
Look, there's been some discussion that we should eliminate cell phones from coming into a courthouse all together. That's a concern that all the judges have had and have expressed, and just limit cell phones to just the attorneys, but that has been  that has not been the practice here, that has not been done. It's something that we will obviously monitor because, if you're concerned, then we're concerned, and that will be monitored throughout the whole trial of the case.
The judge then asked counsel whether they wanted anything more to be said, and all responded in the negative.
The next day, the court reminded the press in attendance that they were not permitted to photograph any juror or lay witness, with the exception of defendant and Reeds. The court repeated the admonition before the start of summations.
We start our analysis by reaffirming that "[a] defendant's right to be tried before an impartial jury is one of the most basic guarantees of a fair trial." State v. Loftin, 191 N.J. 172, 187, 922 A.2d 1210 (2007). As Judge Shebell wrote thirteen years ago concerning a case from Essex County that also generated a great deal of media attention,
a defendant is entitled to a jury that will decide the charge according to the evidence presented in court and a jury that is free of outside influences. The jury verdict must be `free from the taint of extraneous considerations and influences,' and a new trial will be granted when jury misconduct or the intrusion of irregular influences into jury deliberations `could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge.' The test is `not whether the irregular matter actually influenced the result but whether it had the capacity of doing so.'
Where the record does not show whether the irregularity was prejudicial, it will be presumed to be so.
[State v. Scherzer, 301 N.J.Super. 363, 486, 694 A.2d 196 (App.Div.), certif. denied, 151 N.J. 466, 700 A.2d 878 (1997) (internal citations omitted).]
If news organizations publish "inherently prejudicial information" during the course of a trial, and it is likely that one or more jurors may have been exposed to it, general warnings to jurors to not read trial publicity will be inadequate. State v. Harris, 156 N.J. 122, 152, 716 A.2d 458 (1998), cert. denied, 532 U.S. 1057, 121 S.Ct. 2204, 149 L.Ed.2d 1034 (2001). Our Supreme Court has defined "inherently prejudicial information" as news reports of a confession, significant evidence that has been suppressed or is otherwise ruled inadmissible, important facts that the defendant will dispute at trial, emotionally charged editorials, and prejudicial accounts *1224 of a defendant's criminal history. Id. at 142-43, 716 A.2d 458.
If the trial judge is satisfied that mid-trial publicity "has the capacity to prejudice a defendant," it should first determine whether there is a realistic possibility that one or more jurors may have been exposed to it. If that possibility exists, the court should voir dire the jurors to determine whether any exposure has occurred. Ibid. See also State v. Feaster, 156 N.J. 1, 53, 716 A.2d 395 (1998). Writing for the Court in State v. Bey, (112 N.J. 45, 86-91, 548 A.2d 846 (1988)) ("Bey I"), Justice Stein admonished the criminal trial bench that
[i]f there is any indication of such exposure or knowledge of extra-judicial information, the court should question those jurors individually in order to determine precisely what was learned and establish whether they are capable of fulfilling their duty to judge the facts in an impartial and unbiased manner, based strictly on the evidence presented in court.
. . . .
[W]here a timely, properly supported midtrial motion to poll the jury concerning prejudicial publicity is refused, and there is a realistic possibility that information with the capacity to prejudice the defendant may have reached one or more members of the jury, the defendant must be given a new trial.
With these principles as our guide, and after carefully reviewing the record before us, we are satisfied that the court acted reasonably and well within its discretionary authority when it declined to conduct individualized voir dire of the jurors after (1) a copy of the Star Ledger was found in the jury room, and (2) some jurors expressed concern that they may have been photographed in the hallway outside the courtroom. We will now more fully examine each of these events.

The Star Ledger Article
Given the nature of its content, the news article contained in the edition of the Star Ledger found in the jury room clearly qualifies as "inherently prejudicial information." The article about the trial revealed defendant's alleged gang membership and his particular ranking or assignment within the gang as an enforcer or assassin. These "facts" (more accurately described as allegations) were correctly withheld by the court from the jurors as both irrelevant and highly prejudicial. Finding the newspaper in the jury room suggests that some juror or jurors may have been exposed to the article, or at least the headline, warranting at least some form of inquiry or voir dire. The judge here conducted such an inquiry.
As noted earlier, the record does not permit us to ascertain the time of day the newspaper was found, who brought the newspaper into the room, or whether the jurors were ever in the room at the same time as the newspaper. Notwithstanding these deficiencies, we have no basis to conclude that the trial judge erred by not interrogating each juror individually. When he questioned the jurors collectively, the judge did not find any cause or evidence to suggest that any of the jurors had been exposed to the article. However, as suggested by Justice Stein in Bey I, the better practice to be employed in the future under these circumstances is to conduct an individualized interrogation of each juror, in camera, on the record, and with counsel present to suggest a different line of questioning or preserve for appellate review any objection to the approach employed by the court.

The Cellphone Incident
The trial judge took prompt and effective measures to investigate this incident, in which an unidentified number of *1225 jurors believed they may have been photographed by an unknown woman in the hallway outside the courtroom. The judge not only promptly investigated the incident and ascertained the innocuous nature of the event, but thereafter took appropriate preventive action to ensure that the probability of this event reoccurring was virtually nonexistent. With the cooperation of the Essex County Sheriff's Department, the trial judge established a protocol for the movement of jurors that provided a proper balance of security and decorum.
We conclude our analysis of this issue by addressing defendant's claim that he was denied his right to a fair and impartial jury as a result of the trial court's failure to properly respond to possible cases of juror bias. The facts of these incidents are as follows:
In the course of the trial, a witness for the State informed the prosecutor that she and one of the jurors had their children in the same daycare. Although she knew the juror by sight, the witness emphasized that she had never spoken to her. Defense counsel did not object to the trial proceeding with the juror at issue remaining, provided that the court instruct all of the jurors that they should advise the court if they recognize any of the witnesses called to testify at trial.
The trial judge denied defendant's counsel's request that the court question the witness further about her interactions with the juror. The judge decided instead to inquire from the jurors, collectively, if they recognized any of the witnesses that had testified at trial. If any juror responded affirmatively, the court would then question that juror individually and outside of the presence of the other jurors. When the court implemented this plan at the end of that day's testimony, none of the jurors responded affirmatively.
Later during the trial, a juror came forward to advise the court that he had recognized one of the operating room nurses who testified as a witness for the State. After the court questioned the juror further, this juror was permitted to remain without objection from any of the parties. Similarly, after the close of evidence, the court received a telephone call from a juror who indicated that he had recognized two spectators in the courtroom. The court questioned the juror individually in chambers, in the presence of counsel. The juror was allowed to remain without objection.
These events demonstrate that the trial judge responded appropriately to each situation. He gave due consideration to the arguments and concerns of counsel and took action tailored to the particular circumstances. These incidents also reveal that the jurors listened and adhered to the court's instructions. State v. Manley, 54 N.J. 259, 271, 255 A.2d 193 (1969). Jurors candidly disclosed specific concerns about their ability to serve, thereby permitting the court to take measured action where warranted.

III

Sentencing Hearing
We start our analysis of the issues raised regarding defendant's sentencing hearing by reaffirming that the "[p]ronouncement of judgment of sentence is among the most solemn and serious responsibilities of a trial court. No word formula will ever eliminate this requirement that justice be done." State v. Roth, 95 N.J. 334, 365, 471 A.2d 370 (1984). Our review of a sentence imposed by the trial court is limited to determining whether the court erred in the exercise of its discretionary authority and its finding of the relevant aggravating and mitigating factors in N.J.S.A. 2C:44-1. State v. Pierce, 188 N.J. 155, 166, 169-70, 902 A.2d 1195 *1226 (2006). In discharging this responsibility, we must determine
first, whether the correct sentencing guidelines ... [or] presumptions, have been followed; second, whether there is substantial evidence in the record to support the findings of fact upon which the sentencing court based the application of the guidelines; and third, whether in applying those guidelines to the relevant facts the trial court clearly erred by reaching a conclusion that could not have reasonably been made upon a weighing of the relevant factors.
[Roth, supra, 95 N.J. at 365-66, 471 A.2d 370.]
The careful application of these factors by dispassionate jurists promotes predictability and uniformity in sentencing, two of the most important aspects of a just sentencing scheme. As noted by our Supreme Court, "there can be no justice without a predictable degree of uniformity in sentencing." State v. Hodge, 95 N.J. 369, 379, 471 A.2d 389 (1984). Stated differently, "[r]andom and unpredictable sentencing is anathema to notions of due process." State v. Moran, 202 N.J. 311, 326, 997 A.2d 210 (2010).
We are
bound to affirm a sentence, even if [we] would have arrived at a different result, as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record. Assuming the trial court follows the sentencing guidelines, the one exception to that obligation occurs when a sentence shocks the judicial conscience.
[State v. O'Donnell, 117 N.J. 210, 215-16, 564 A.2d 1202 (1989) (internal citations omitted).]
Here, the court sentenced defendant to five consecutive maximum terms. The sentence breaks down as follows: a ten-year term on the reckless manslaughter conviction, with an eighty-five percent period of parole ineligibility and three years of parole supervision, the last two restrictions being mandated by NERA; a five-year term on the receiving stolen property conviction, with two and one-half years of parole ineligibility; a five-year term on the possession of a controlled dangerous substance conviction, with two and one-half years of parole ineligibility; a five-year term on the unlawful possession of a weapon conviction, with two and one-half years of parole ineligibility; and a five-year term on the terroristic threats conviction, with two and one-half years of parole ineligibility. This translates into an aggregate sentence of thirty years, with eighteen and one-half years of parole ineligibility.
Defendant argues that his sentence must be vacated because the judge failed to respect the jury's verdict and violated his rights to a jury trial and due process of law. After reviewing the entire sentencing hearing, we are compelled to vacate the sentence as improperly influenced by the judge's perception that the jury rendered an unjust verdict in defendant's favor. A sentence that is so tainted is un-tethered to the rule of law and cannot stand.
The first indication of the judge's indignation with respect to the jury's verdict was revealed at the sentencing hearing when defendant addressed the court on his own behalf. Defendant asserted his innocence that he did not shoot Officer Reeves, and questioned the prosecutor's motive in charging him with murder:
[The Prosecutor's Office] know[s] why they are trying to put this charge on me, not because of nothing I did, but because of who they think I am. I don't know why they will act like this situation is so serious so them by blaming me, [sic] and 
*1227 At this point, the judge interrupted defendant and asked him, with a sense of incredulity: "Why this is serious to them?" Defendant indicated that he was addressing the prosecutor and asked the court, "Can you please let me finish?" The judge responded "I'll interrupt when I want. When you make a ludicrous statement like that, `Why is this so serious to the Prosecutor's Office' " These remarks prompted the following exchange between defendant and the judge:
DEFENDANT: No. I'm saying that the Prosecutor's Office is acting like it's so serious to them when obviously they don't care who shoot [sic] Police Officer Reeves, because, if they did, the person who shot Police Officer Reeves would paying for it right now. There's no way that a jury would find a person guilty of reckless manslaughter when a police officer is gunned down in broad daylight, knew something didn't go right in the situation at all ..."
THE COURT: Yeah, maybe the jurors were scared.
DEFENDANT: Scared of who? Who were they scared of?
THE COURT: Maybe they were scared.
DEFENDANT: The truth is the truth. You cannot out something on somebody, you cannot frame nobody and think you going [sic] to have your way with 
THE COURT: You're very misunderstood, Mr. Tindell. Everyone else is wrong, everyone else lies, the world is out to get you. You're a very misunderstood person.
DEFENDANT: Sir, did you see the lies that took place in your courtroom?
THE COURT: Yeah, from [Police Officer] Karama Thomas.
This exchange continued to a point at which, in response to defendant's claim that the prosecutor had not obtained justice for Officer Reeves, the judge stated to defendant, "There is an injustice. The injustice is that you were only convicted of a reckless manslaughter."
When the time came for the court to sentence defendant, the judge began by outlining the crimes for which defendant had been found guilty. The judge then made the following comments concerning the verdict rendered by the jury:

Simply stated, the jury's verdict enabled this defendant to literally get away with murder. This jury has given defendant Tindell a license to kill in the future. Before I get into the facts of the matter and my decision on the sentencing, I want to first commend all the attorneys involved in the case for the professional manner in which they presented their respective positions. It was an exceptionally well tried case on all sides.
Mr. Tindell, you owe a great deal to your attorney, because he saved you a murder conviction. There's no doubt in my mind that his lawyering skills, together with a jury which lacked common sense and courage, saved you a murder verdict.
I commend the Jury for having the courage to sit on the case. We summonsed over 2000 jurors to get a jury of 16 people. Why they rendered the verdict the way they did is within their own minds. Did fear play a role? I think it did.

[(Emphasis added).]
Further along in his sentencing comments, the judge made the following remarks with respect to Officer Karama Thomas:
[Defendant's counsel] cited [in his summation to the jury] Karama Thomas' courage. However, I found this Wonder Woman cop to be a liar. She can see through brick walls, leap tall buildings in a single bound, run down flights of *1228 stairs in seconds, see through buses and cars and sprint faster than Marion Jones on steroids.

She couldn't possibly have seen what she said she saw. There had to have been contact between the defendant and [defendant's sister][10] after the shooting. She had his blood on her jeans.
Why Police Officer Thomas would lie should be the subject of investigation. Either she broke protocol and allowed contact between the defendant and [his sister] and is now afraid to admit it, or she has some connection to this defendant. After all Lakeisha Tutt, the defendant's aunt, wrote me a letter saying that she has friends in law enforcement.
[ (Emphasis added).]
The judge then proceeded to sentence defendant to the maximum sentence for each of the five crimes he was convicted of, including the maximum period of parole ineligibility. He also ordered that the terms of sentence run consecutive to each other. As noted earlier, ordinarily our role as an appellate court is limited to reviewing whether a judge's findings with respect to the aggravating and mitigating factors are supported by the evidence in the record. O'Donnell, supra, 117 N.J. at 215-16, 564 A.2d 1202. If a court followed the sentencing guidelines, we may vacate a sentence only if it shocks our collective judicial conscience. Ibid. However, this is not an ordinary case.
Our Supreme Court has made clear that a judge may not criticize jurors for their verdict. In Re Mathesius, 188 N.J. 496, 520-21, 910 A.2d 594 (2006); Code of Judicial Conduct, Canon 3A(10). Nor are judges permitted to act as a "thirteenth juror," substituting their judgment for that of the jury. State v. Whitaker, 79 N.J. 503, 515-16, 401 A.2d 509 (1979). We are thus empowered  indeed obligated  to correct a clearly unreasonable sentence, even if the judge applied correctly the statutory sentencing guidelines. Roth, supra, 95 N.J. at 364-65, 471 A.2d 370.
Although written in the context of deciding whether a civil verdict on damages should be set aside as excessive, an indisputably far less important matter than the one we confront here, the words of Chief Justice Hughes in Baxter v. Fairmont Food Co., 74 N.J. 588, 596, 379 A.2d 225 (1977), nevertheless remain particularly poignant in this context: "[A]ll judges, whether trial or appellate, are human and [] the judgment of each is inevitably affected by subjective prejudices or predispositions relating to properties or specific tendencies of the individual mind, as distinguished from general or universal experience."
This case involved the death of a police officer who was killed in the line of duty. We recognize that any reasonable person would find this case especially morally repugnant. Like all human beings, judges are not immune from having strong feelings about such matters. However, judges are trained legal professionals; those judges who sit in criminal cases are charged with the great responsibility of administering our criminal justice system in a fair, rational, and impartial manner.
A judge may not permit his or her sense of moral outrage and indignation to overwhelm the legal process. The need for dispassionate, evenhanded conduct is most acute in the sentencing phase of a criminal trial. For it is in this critical phase of the criminal process that the judge's role changes, from an arbitrator of legal disputes that arise in the course of the trial, to the dispenser of society's justice. In this role, the judge must act in a manner that reassures all affected  defendant and his family, the victims and their families, *1229 and society at large  that he or she will be guided exclusively by the factors established by law and not by the judge's personal code of conduct.
Defendant was tried before a jury on the charge of first degree purposeful or knowing murder of this officer. The jury found him guilty of the lesser included offense of second degree reckless manslaughter. This verdict represents the collective judgment of twelve of defendant's fellow citizens, who were summoned to serve, were compelled to disclose details about their personal affairs in order to ensure that their judgment would not be skewed by any extraneous matters, and swore an oath to determine the facts from the evidence presented at trial. Absent evidence of corruption or other indicia of wrongdoing, that verdict deserves our respect.
Here, the trial judge took exception to the verdict, speculating about juror intimidation despite the extensive measures he took to ensure the safety of each juror, as well as to keep extraneous and prejudicial materials from influencing their judgment. We have rejected defendant's arguments attacking the efficacy of these measures, and, in so doing, praised the judge for properly responding to these challenges. Ironically, the judge's own successful management of this potentially volatile case negates his unfounded speculation and the aspersions he expressed at the sentencing hearing concerning the jurors' character and independence.
We also find highly problematic the judge's statements questioning the veracity of Officer Karama Thomas' trial testimony. Independent of the impropriety of such comments, we find particularly disturbing the judge's use of sarcastic language referring to Thomas as "Wonder Woman" and "Marion Jones on steroids." Such language undermines the public's confidence in the judiciary and is antithetical to the decorum expected from a sitting judge.
Given this record, we conclude that the trial judge's personal views as to the propriety of the jury's verdict irreparably tainted the sentence he imposed on defendant. We are thus left with no other choice but to vacate the sentence and remand for defendant to be re-sentenced consistent with this opinion and before a different judge to be selected by the Presiding Judge of the Criminal Division of the vicinage.

IV
By way of summary, we affirm defendant's conviction of second degree reckless manslaughter, reverse and remand for a new trial the conviction of third degree terroristic threats, and vacate the conviction of third degree receiving stolen property and remand for the entry of a judgment of acquittal on that charge. We also vacate the sentence imposed by the court in its entirety and remand for re-sentencing before a different judge. We do not retain jurisdiction.
NOTES
[1] Defendant is also known as Khalil Tutt. He was referred to as "Tutt" by witnesses throughout the trial without objection.
[2] Reeds also appealed his conviction. By order dated September 15, 2008, we calendared both appeals (Tindell and Reeds) back-to-back and heard oral argument as to both cases at the same time. In State v. Reeds, Docket No. A-4101-07, 2011 WL 43314, the companion opinion filed on January 7, 2011, we vacated Reeds' conviction of third degree receiving stolen property and remanded for the trial court to enter a judgment of acquittal on this charge as a matter of law.
[3] Special police officers are employed by local units of government under the provisions of N.J.S.A. 40A:14-146.10. The chief of police of the local unit "may authorize special law enforcement officers when on duty to exercise the same powers and authority as permanent, regularly appointed police officers of the local unit, including, but not limited to, the carrying of firearms and the power of arrest...." N.J.S.A. 40A:14-146.15. Here, the jury heard testimony that special police officers perform the same duties and have the same law enforcement powers as regular police officers employed by the City of Newark. The only difference between the two is that special police officers are not part of the civil service system.
[4] It is noted that the vehicle owner's name is spelled "Kalantrov" in the indictment but is spelled "Kalantarov" throughout the remainder of the record. As there is no issue as to the vehicle owner's identity, the spelling "Kalantarov" shall be used here unless quoted in the indictment.
[5] Although Officer Irvin described the vehicle as a Chrysler model 300M, all of the other witnesses who testified described the car as a model 300 or 300C.
[6] "A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence." N.J.S.A. 2C:2-2(b)(2).
[7] In the interest of completeness, we note that defendant was carrying a concealed, unlicensed handgun at the time of his interaction with Officer Reeves. Thus, it is equally plausible to infer that defendant resisted arrest to prevent Reeves from patting him down and thereby discovering the weapon.
[8] Although not directly addressing the issue we confront here, in State v. Butterfoss, 234 N.J.Super. 606, 611-12, 561 A.2d 312 (Law Div.1988), Judge Haines found sufficient facts to uphold the count in an indictment charging the defendant with third degree terroristic threats under N.J.S.A. 2C:12-3(a) based on the defendant's direct communications to his estranged wife that he intended to break into her house, bind and gag her, and take her child against her will.
[9] It is unclear from the record when in the day the newspaper was found or who found it. We assume that a Sheriff's Officer discovered the newspaper in the course of inspecting the jury room before the jurors returned from lunch or at some other point in time when the jurors were not occupying the jury room. It is distressing, however, that we are left to speculate as to how this extremely important incident came to the court's attention. In order for meaningful appellate review to occur, trial judges must take the steps necessary to ensure that the record reflects how these events unfold.
[10] We withhold the name of defendant's sister because she is a minor.