**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5797-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

TIMOTHY T. KNIGHT, a/k/a
JOHN REED,

     Defendant-Appellant.

_____

          Submitted February 25, 2020 – Decided April 7, 2020

          Before Judges Fisher and Rose.

          On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 15-11-2737.

          Joseph E. Krakora, Public Defender, attorney for appellant (Laura B. LaSota, Assistant Deputy Public Defender, of counsel and on the brief).

          Damon G. Tyner, Atlantic County Prosecutor, attorney for respondent (John Joseph Santoliquido, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

At eight o'clock in the morning of a mid-July day in 2015, local police were called to an alleyway in Atlantic City where they found Justin Turay's lifeless body, riddled with more than twenty stab wounds to his chest and abdomen. Turay's body was lying beneath an open second-story window of a rooming house. One of the residents told police she saw bloodstains on a second-floor door. Police knocked on the door. Defendant answered wearing boxer shorts and no shirt. The odor of bleach permeated the room. Trembling, defendant volunteered, "I didn't do anything, I didn't do it." Defendant had several minor cuts on his fingers; he was not bleeding. Police arrested defendant without incident. Two knives were recovered from defendant's bed.

The sole issue in the case was defendant's mental state at the time of the homicide. Defendant did not dispute he killed Turay, his sometimes roommate. In overlapping arguments, defendant contended he stabbed Turay in self-defense; acted under a reasonable provocation; and suffered from a mental disease or defect resulting from bipolar mood disorder and polysubstance abuse. The State countered defendant's actions and words supported a purposeful or knowing murder conviction.

The State's case was bolstered by the testimony of multiple responding law enforcement officers, and the rooming house resident who told police about the blood on defendant's door. The State also called two medical experts: an

2

orthopedic surgeon, who opined the lacerations on defendant's fingers were not consistent with defensive wounds; and the medical examiner, who concluded the cause of death was stab wounds to the chest and abdomen.

Defendant testified on his own behalf. He said Turay had accused him of stealing a pair of sneakers; the men engaged in a physical altercation; Turay pulled a knife; defendant wrested the weapon from Turay and "poked" him with it until he stopped fighting defendant. Defendant then hurled Turay's body through the window and cleaned the room to avoid police detection.

Defendant also presented the testimony of two lay witnesses, including Taiwan Taylor, who said Turay had stabbed him four months before the present matter (Taylor incident); and an expert witness, Charles Martinson, M.D., a forensic psychiatrist. Dr. Martinson opined defendant "was suffering from diminished capacity at the time of the[] events and his conduct did not meet the specific intent needed to establish a murder conviction."

Following a bifurcated trial, a jury convicted defendant of second-degree passion/provocation manslaughter and third-degree possession of a knife for an unlawful purpose; the judge thereafter convicted defendant of fourth-degree certain persons not to have weapons. After denying defendant's motion for a new trial, ordering the appropriate merger, and granting the State's motion for a discretionary extended term, N.J.S.A. 2C:43-7, the judge sentenced defendant

3

to an aggregate nineteen-year prison term, with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

On appeal, defendant raises the following points for our consideration:

POINT I

THE TRIAL COURT DEPRIVED DEFENDANT OF HIS RIGHTS TO PRESENT A DEFENSE, TO DUE PROCESS, AND TO A FAIR TRIAL BY IMPROPERLY PRECLUDING DEFENSE COUNSEL FROM INTRODUCING EVIDENCE THAT THE VICTIM HAD PREVIOUSLY BEEN THE AGGRESSOR TOWARDS ANOTHER IN THAT PERSON'S OWN APARTMENT.

POINT II

THE PROSECUTOR ENGAGED IN MISCONDUCT REQUIRING REVERSAL OF DEFENDANT'S CONVICTIONS WHEN, DURING CROSS-EXAMINATION OF THE DEFENSE EXPERT AND IN SUMMATION, HE COMMENTED ON THE EXPERT HAVING BEEN COMPENSATED BY THE DEFENSE.

POINT III

THE TRIAL COURT ERRED IN LIMITING THE JURY'S CONSIDERATION OF DEFENDANT'S DIMINISHED CAPACITY DEFENSE TO MURDER AND POSSESSION OF A WEAPON FOR AN UNLAWFUL PURPOSE WHEN THE DEFENSE ALSO APPLIED TO THE LESSER-INCLUDED OFFENSE OF PASSION/PROVOCATION MANSLAUGHTER.
(Not Raised Below)

4

POINT IV

DEFENDANT'S SENTENCE IS MANIFESTLY EXCESSIVE AND MUST BE REDUCED.

We reject these arguments and affirm.

I.

In his first point, defendant contends the trial judge impeded the presentation of his self-defense claim by denying his application to present evidence of one of two incidents in which Turay had been the aggressor. Prior to trial, defendant filed a motion in limine, pursuant to N.J.R.E. 404(b), to admit evidence of the Turay incident and another incident involving Diesuseul Marcelin (Marcelin incident). Defendant testified at the N.J.R.E. 104 hearing. His testimony was limited to the Taylor incident, stating he found out Turay stabbed Taylor while the ambulance was still on the scene. Defendant's evidence of the Marcelin incident was limited to hearsay statements contained in a police report. Defense counsel candidly conceded defendant was not aware of the Marcelin incident when he stabbed Turay.

Following the hearing, the trial judge issued a well-reasoned written decision, granting defendant's motion to admit evidence of the Taylor incident, and denying the motion as it pertained to the Marcelin incident. The judge was persuaded that, unlike the Taylor incident, defendant was unaware of the

5

Marcelin incident when defendant killed Turay. Accordingly, the Marcelin incident had no bearing upon "[d]efendant's state of mind for self-defense."

Defendant maintains the trial judge improperly denied his motion to admit evidence of the Marcelin incident under Rule 404(b). For the first time on appeal, he also contends the evidence was admissible under subsection (a) of that Rule. We have considered defendant's arguments in light of the record and applicable legal principles, and conclude they are without sufficient merit to warrant discussion in a written opinion, R. 2:11-3(e)(1)(E), beyond the following brief comments.

We affirm the judge's decision to preclude evidence of the Marcelin incident under Rule 404(b) for the reasons cogently expressed by the trial judge. We simply note "[o]ur courts have always admitted evidence of a victim's violent character as relevant to a claim of self-defense so long as the defendant had knowledge of the dangerous and violent character of the victim." State v. Gartland, 149 N.J. 456, 473 (1997) (emphasis added). Defendant was unaware of the Marcelin incident when he claimed self-defense in the present matter and, as such, the judge properly excluded evidence that Turay stabbed Marcelin.

We briefly address defendant's assertion that the Marcelin incident was admissible under Rule 404(a)(2),[1] noting we review defendant's newly-minted contention for plain error.  R. 2:10-2.  We have long recognized "Rule 404(a)(2) provides one of the few instances in which character evidence is admissible to allow the jury to infer that a person acted on a specific occasion in conformity with his character."  State v. Aguiar, 322 N.J. Super. 175, 182 (App. Div. 1999).  But, Rule 405 limits evidence of specific instances of conduct to prove a character trait where the trait is "an essential element of [the] charge, claim, or defense."  And, as our Supreme Court has recognized "a victim's violent character is not an essential element of self-defense," thus making specific instances of bad conduct inadmissible to prove the character trait.  State v. Jenewicz, 193 N.J. 440, 463 (2008).

Moreover, unlike the Taylor incident, defendant's purported evidence of the Marcelin incident was limited to hearsay statements contained in a police report, "alleg[ing] an 'unwanted male' was at [Marcelin's] apartment"; Turay

---

[1]  Rule 404(a)(2) states, in relevant part:

> Evidence of a person's character or character trait . . . is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion except: . . . Evidence of a pertinent trait of character of the victim of the crime offered by an accused . . . .

"alleged[ly] was the 'unwanted male'"; and he was "acting in a threatening manner and accusing Marcelin of stealing his money." We therefore find no error, let alone plain error, in the trial court's order, denying hearsay evidence of the Marcelin incident at trial.

## II.

Defendant next argues the prosecutor repeatedly engaged in misconduct during cross-examination of Dr. Martinson and in summation by improperly suggesting the expert's testimony was not credible and his opinion was "shaded" "because he had been hired and paid by the defense." We disagree.

Defendant first objects to the following line of inquiry:

> PROSECUTOR: And you have been or will be paid for your work in this case, is that correct?
>
> DR. MARTINSON: That's correct.
>
> PROSECUTOR: That's paid on behalf of the defense, correct?
>
> DR. MARTINSON: Yes.
>
> PROSECUTOR: And you had mentioned that there was [sic] some communications between yourself and [the] defense attorney regarding the lack of requisite state of mind defense, right?
>
> DR. MARTINSON: Correct.
>
> PROSECUTOR: So you knew that before you evaluated the defendant, right?

8

DR. MARTINSON: Yes.

PROSECUTOR: So . . . you evaluated some of the case materials that you spoke about, interviewed the defendant and wrote those two reports, right?

DR. MARTINSON: Correct.

PROSECUTOR: You were aware if the report was not helpful to the defense that you would probably not be asked to testify, correct?

DR. MARTINSON: My experience has been that my opinion is accepted whether it's favorable or not. That's been my experience with the prosecutor's office. I haven't [had] as broad an experience with defense counsel.

Later in the examination, when Dr. Martinson acknowledged he had not been "hired to treat . . . defendant for his mental illness," the trial judge overruled counsel's ensuing objection that the prosecutor improperly emphasized the expert had been paid for his testimony. Notably, the prosecutor did not ask Dr. Martinson any questions concerning the amount of his fee.

At the conclusion of defendant's case, the judge held a charge conference. Relevant here, the judge indicated he would issue the standard expert jury charge. See Model Jury Charges (Criminal), "Expert Testimony" (rev. Nov. 10, 2003). Neither defendant nor the State objected nor requested the optional expert charge, or a modification of that charge. See Model Jury Charges (Criminal), "Optional Charge Concerning Compensation of Experts" (approved

9

Oct. 2001) (permitting the jury to "consider the compensation received by the expert witness(es) as bearing on (his/her/their) credibility").

During his summation, the prosecutor discussed the trial evidence in detail, including Dr. Martinson's testimony. The prosecutor commented that the expert was "hired for his expertise in th[e] field of forensic psychiatry"; knew "from the start" what "his role was"; and needed "to get to the conclusion that the defense was looking for . . . ." At the conclusion of the prosecutor's closing argument, defense counsel objected generally to those comments.

Noting that he had intended to give the jurors the optional charge regarding compensation of experts, the trial judge instead suggested he "could instruct [the jury] that the fact that experts are paid for their time and their efforts is something that the jury should not consider." Defense counsel agreed with that option. Accordingly, the judge gave the following curative instruction immediately before he issued the full jury charge:

> [T]here were statements made about an expert being hired. I'm going to give you an instruction in just a few moments about how to treat expert testimony, but I instruct you now that expert witnesses who testify, of course, are paid for their work. Experts are paid for their special knowledge, experience, skill, and training. I instruct you however, that the fact that an expert may have been compensated for their opinions is not relevant to your consideration of their opinion [sic]. You should rather be guided by my instructions about expert testimony in deciding how or whether you will consider, reject or accept any opinion of any expert.

[(Emphasis added).]

Defendant now argues the prosecutor's questions and comments violated our Supreme Court's warnings in State v. Smith, 167 N.J. 158 (2001). Defendant's reliance on Smith is misplaced.

In Smith, the Court addressed the prosecutor's continual references in his summation to the fees that the defense's expert witnesses charged. Id. at 174-76. There, the prosecutor told the jury it need not accept the defense experts' testimony "just because somebody with a degree or with whatever qualifications says that that's the way it is." Id. at 174. The prosecutor also suggested experts can tailor their testimony to satisfy the litigation needs of their clients in order to assure future retainers. Ibid. Defense counsel immediately objected to the prosecutor's argument and a curative instruction was issued by the trial judge. Ibid. But, immediately thereafter the prosecutor again told the jury it could consider whether the defense expert "shaded his testimony." Id. at 174-75.

In its final charge to the jury, the judge in Smith instructed it was not improper for an expert to be paid a reasonable fee. Id. at 175-76. Nonetheless, the Court held the prosecutor's remarks were improper. Id. at 188. The Court found that the judge's several curative instructions were not enough to remedy the prosecutor's misconduct, particularly given his remark immediately following the first curative instruction. Ibid.

11

Those circumstances do not exist in this case. Dr. Martinson's payment was not a dominant theme of the prosecutor's cross-examination or his summation. The prosecutor neither stated nor implied that Dr. Martinson was paid "hefty fees" that would color his testimony on behalf of defendant or in an effort to be retained in future cases. Cf. id. at 174. Further, Dr. Martinson rejected the prosecutor's implication that the expert would slant his testimony to assist the defense.

Moreover, any alleged errors were corrected by the judge's curative instruction, which was issued immediately after the prosecutor's summation. State v. McKinney, 223 N.J. 475, 497 (2015) ("A trial judge is permitted and encouraged to correct errors that occur during trial," and "[a] curative jury instruction is one method to remedy trial error."). Indeed, the judge's instruction went beyond the model charge – and the judge's charge in Smith – advising the jury the expert's fee was irrelevant in its consideration of his opinion. "We must assume the jury followed the court's instruction." State v. Little, 296 N.J. Super. 573, 580 (App. Div. 1997). We therefore conclude the prosecutor's questions and comments did not deprive defendant of his right to have the jury fairly evaluate the evidence and his defense. State v. Nelson, 173 N.J. 417, 460 (2002).

# III.

In his third point, which was not raised below, defendant contends his passion/provocation manslaughter conviction must be reversed because the trial judge improperly instructed the jury that defendant's diminished capacity defense did not apply to that charge. We disagree.

During the charge conference, both parties agreed with the trial judge's proposal to instruct the jury that defendant's diminished capacity defense applied to any charge with "a mens rea, purposeful or knowing, so it would apply to the two counts of the indictment to be considered by the jury." The judge clarified that the defense would apply to "murder and unlawful possession,[2] it would not apply to agg[ravated] man[slaugher] or reck[less] man[slaughter]." When the judge asked whether "[b]oth sides agree[d] with that analysis[,]" the prosecutor responded in the affirmative; defense counsel did not respond verbally; and the judge turned to the next jury charge issue.

The judge's charging decision was consistent with Dr. Martinson's opinion that defendant's conduct at the time of the incident was not "knowing and purposeful by reason of his mental illness and by reason of th[e] mixed depressive manic state that he was operating under." The judge conformed the

---

[2] We assume the judge was referring to possession of a weapon for an unlawful purpose, which was the only weapons offense charged in the indictment that was submitted to the jury.

13

standard charge pertaining to defendant's diminished capacity defense accordingly. See Model Jury Charges (Criminal), "Evidence of Mental Disease or Defect (N.J.S.A. 2C:4-2)" (rev. June 5, 2006).

Pertinent to this appeal, the judge instructed the jury: "There is an issue which pertains to the following offenses: murder and possession of a weapon for an unlawful purpose. This issue does not pertain to passion provocation/manslaughter, aggravated manslaughter or reckless manslaughter." (Emphasis added). Consistent with the model jury charge, the judge informed the jury that it must consider defendant's mental state "in determining whether or not the State has proven beyond a reasonable doubt that [defendant] acted with the requisite state of mind forming any element of the offenses charged in the indictment, namely, murder and possession of a weapon for an unlawful purpose."

At trial, defendant neither objected to that charge – nor any of the substantive charges – read to the jury. On appeal, defendant does not challenge the mental disease or defect instruction, its application to the murder and possession of a weapon for an unlawful purpose charges, or its inapplicability to the aggravated manslaughter and reckless manslaughter charges. Instead, defendant claims the judge erred because passion/provocation manslaughter,

14

like murder and possession of a weapon for an unlawful purpose, requires purposeful or knowing conduct.

Because defendant did not raise his objection to the jury instruction before the trial judge, we again view this contention through the prism of the plain error standard. R. 2:10-2. Under that standard, "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result . . . ." Ibid.; see also R. 1:7-5; State v. Morais, 359 N.J. Super. 123, 134 (App. Div. 2003) (A "[d]efendant is required to challenge instructions at the time of trial.").

Our jurisprudence has long recognized accurate and understandable jury instructions in criminal cases are essential to a defendant's right to a fair trial. State v. Concepcion, 111 N.J. 373, 379 (1988). Without such instructions to guide the jury, "a jury can take a wrong turn in its deliberations." Nelson, 173 N.J. at 446. "So critical is the need for accuracy that erroneous instructions on a material point are presumed to be reversible error." State v. Martin, 119 N.J. 2, 15 (1990).

As a corollary to those principles, "clear verdict sheet directions" are also important. Nelson, 173 N.J. at 449. A jury's "efforts to answer questions that they may have about verbal instructions almost certainly [will] involve an examination of the verdict sheet directions." Ibid. "If verbal instructions are

unclear, or if jurors do not fully comprehend verbal instructions, the typewritten verdict sheet is likely the primary road map they will use to direct their deliberative path." Ibid.

"Passion/provocation manslaughter[3] is an intentional homicide committed under extenuating circumstances that mitigate the murder." State v. Robinson, 136 N.J. 476, 481 (1994). According to the Criminal Code, passion/provocation manslaughter is "[a] homicide which would otherwise be murder . . . [but] is committed in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4(b)(2). "Thus, passion/provocation manslaughter is considered a lesser-included offense of murder: the offense contains all the elements of murder except that the presence of reasonable provocation, coupled with defendant's impassioned actions, establish a lesser culpability." Robinson, 136 N.J. at 482; see also N.J.S.A. 2C:1-8(d)(3).

"Passion/provocation manslaughter exists to mitigate the penalties associated with the offense of murder when an actor intentionally kills another but does not possess the quality of culpability necessary for a murder conviction." Robinson, 136 N.J. at 488. The diminished capacity defense goes

---

[3] "Passion/provocation manslaughter has four elements: (1) reasonable and adequate provocation; (2) no cooling-off time in the period between the provocation and the slaying; (3) a defendant who actually was impassioned by the provocation; and (4) a defendant who did not cool off before the slaying." State v. Mauricio, 117 N.J. 402, 411 (1990).

16

further; it "is a 'failure of proof' defense: evidence of defendant's mental illness or defect serves to negate the mens rea element of the crime." State v. Reyes, 140 N.J. 344, 354 (1995).

Not surprisingly, defendant has not cited any authority or articulated how the application of his diminished capacity defense to the passion/provocation manslaughter charge would have provided a rational basis for the jury to either acquit him of that offense or provide a basis for a lesser-included offense that was not provided to the jury. An analysis of the verdict sheet provided to the jury thus guides our review.

At the outset, we note the verdict sheet closely followed the model verdict sheet included at the end of the model charge, which the trial judge conformed in accordance with the evidence adduced at trial. See Model Jury Charges (Criminal), "Murder, Passion/Provocation and Aggravated/Reckless Manslaughter (N.J.S.A. 2C:11-3a(1) and (2); 2C:11-4a, b(1) and b(2))" (rev. June 8, 2015). Defendant did not object to the verdict sheet.[4]

---

[4] At the conclusion of the full charge, defense counsel asked the judge why self-defense was not included on the verdict sheet. The judge explained it was not his usual practice to "ask a separate question about it. It's a suggestion that the [jurors] find if it applies. If their answer is not guilty, that's it." Defendant posed no further objection to the verdict sheet or the self-defense instruction, which followed the model jury charge. See Model Jury Charges (Criminal), "Justification - Self Defense in Self Protection (N.J.S.A. 2C:3-4)" (rev. June 13, 2011). Nor does defendant challenge the self-defense instruction on appeal.

Under the murder count, the first question on the verdict sheet asked the jury whether it found defendant: (a) "Not Guilty of Murder"; (b) "Guilty of Passion/Provocation Manslaughter"; (c) "Guilty of Murder." The verdict sheet then instructed the jury to proceed to the second question if they found defendant not guilty of murder. The second and third questions then asked whether defendant was not guilty or guilty of aggravated manslaughter and reckless manslaughter, respectively.[5]

Importantly, the jury instructions and the verdict sheet properly guided the jury to consider defendant's passion/provocation defense in connection with the murder charge. Cf. State v. Galicia, 210 N.J. 364, 369 (2012) (observing that despite the trial court's accurate instructions, "the verdict sheet improperly directed the jury not to consider the issue of passion/provocation unless it had already reached a guilty verdict on the murder charge."). Moreover, the judge informed the jury, in pertinent part:

> If . . . the State has failed to prove beyond a reasonable doubt that . . . defendant purposely or knowingly caused death or serious bodily injury resulting in death, you must find . . . defendant not guilty of murder and passion provocation/manslaughter and go on to consider whether . . . defendant should be convicted of the crimes of aggravated or reckless manslaughter.

---

[5] Under the possession of a weapon for an unlawful purpose count, the verdict sheet asked whether defendant was not guilty or guilty. As expected, the verdict sheet did not contain a lesser-included alternative for a passion/provocation offense under that count. Defendant does not appeal that count.

18

The jury therefore was fully informed it had the option of finding defendant not guilty of murder if he lacked the capacity to act knowingly and purposely. In that event, the jury was properly directed to bypass passion/provocation manslaughter and instead go on to consider the lesser-included offenses of aggravated[6] or reckless manslaughter. By finding defendant guilty of passion provocation murder, the jury determined he lacked "the quality of culpability necessary for a murder conviction," Robinson, 136 N.J. at 488, but rejected his diminished capacity defense. Notably, the jury also found defendant guilty of possession of a weapon for an unlawful purpose, similarly rejecting the defense as it applied to that charge. We therefore find no error, let alone plain error, in the judge's instruction as given.

## IV.

Lastly, we address defendant's excessive sentencing argument. Citing our decision in State v. Tindell, 417 N.J. Super. 530, 570-72 (App. Div. 2011), defendant primarily argues the judge improperly "injected his own personal opinions about the case" and disregarded the jury's verdict by sentencing defendant to the "near maximum extended-term sentence." Defendant does not,

---

[6] Because aggravated manslaughter is a first-degree crime, N.J.S.A 2C:11-4 (a) and (c), had the jury returned a guilty verdict on that lesser-included offense, defendant's sentencing exposure would have been greater than that imposed on his passion/provocation manslaughter conviction.

19

however, challenge imposition of the extended term. Nor does he argue the judge failed to follow the sentencing guidelines or that his findings of the aggravating factors were not supported by evidence in the record. Guided by our highly deferential standard of review, State v. Fuentes, 217 N.J. 57, 70 (2014), we are unpersuaded by defendant's contentions.

Once a defendant meets the statutory criteria to qualify as a persistent offender under N.J.S.A. 2C:44-3, "the range of sentences, available for imposition, starts at the minimum of the ordinary-term range and ends at the maximum of the extended-term range." State v. Tillery, 238 N.J. 293, 324 (2019). Because passion/provocation manslaughter is a second-degree crime, the ordinary range of five to ten years, see N.J.S.A. 2C:43-6(a)(2), was extended here to five to twenty years, see N.J.S.A. 2C:43-7(a)(3); see also Tillery, 238 N.J. at 324. After the sentencing court has balanced the aggravating and mitigating factors set forth in N.J.S.A. 2C:44-1(a) and (b), it "may impose a term within the permissible range for the offense." State v. Bieniek, 200 N.J. 601, 608 (2010).

The trial judge found – and ascribed great weight to – aggravating factors three, the risk that defendant will commit another offense; six, the extent and seriousness of defendant's prior record; and nine, the need to deter defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(3), (6), (9); but declined

20

to find aggravating factor one, the homicide involved particular depravity and cruelty, N.J.S.A. 2C:44-1(a)(1). The judge also found – but afforded slight weight to – mitigating factors three, defendant acted under a strong provocation; four, substantial grounds tended to excuse or justify defendant's conduct; and five, the victim's conduct facilitated or induced the commission of the offense. N.J.S.A. 2C:44-1(b)(3), (4) and (5).

Defendant takes issue with the judge's comments, citing the first portion of his reasons for affording slight weight to the mitigating factors:

> While the jury may have been persuaded that the defendant's conduct amounted to passion/provocation manslaughter, the provocation objectively viewed was trivial. Even accepting the defendant's version of events, an argument over shared living arrangements, stolen sneakers, or an unwelcome and unsavory houseguest, is not sufficient justification to mitigate the defendant's use of extreme and bloody violence in claiming a man's life.

But, defendant fails to note the continuation of the judge's rationale:

> Similarly, the defendant's assertions of self-defense ring hollow in the total circumstances. The defendant clearly resorted to the use of a weapon in close quarters, and then sought to cover up his wrongdoing by disposing of the body and cleaning the crime scene. These actions greatly diminish the weight of these three suggested mitigating factors.

The judge also cited the "overwhelming" trial evidence, including defendant's disposal of Turay's body by "throwing it out of the second-story

21

window," and defendant's extensive prior record. That record consisted of forty arrests in three states, including seven indictable convictions and eight disorderly persons offenses in New Jersey; violations of probation; and an indictment for a weapons offense charge while defendant was in jail awaiting trial for the present offense. Indeed, prior to sentencing, defendant pled guilty to unlawful possession of a "shiv" made from "a four-inch sharpened piece of metal wire" on the day of sentencing.

We reject therefore any comparison between defendant's sentencing proceeding and the proceeding conducted in Tindell. In that case, the judge imposed five consecutive maximum sentences, including maximum periods of parole ineligibility. 417 N.J. Super. at 570. We cited extensively to the judge's inappropriate comments at sentencing, id. at 568-70, and concluded his "personal views as to the propriety of the jury's verdict irreparably tainted the sentence he imposed on defendant." Id. at 572.

By contrast, our review of the transcript here convinces us defendant's sentence was not the result of similar judicial irritation or obvious abuse of discretion. The trial judge sentenced defendant to a nineteen-year term of imprisonment, with an eighty-five percent period of parole ineligibility pursuant to NERA, and a concurrent prison term of eighteen months on the certain persons not to have weapons conviction. The judge carefully considered the

22

defendant's record and the trial evidence, and his comments were not out of bounds.

We conclude the trial judge properly identified and weighed the applicable aggravating and mitigating factors and sentenced defendant within the permissible range for an extended-term second-degree offender. Bieniek, 200 N.J. at 608. We perceive no abuse of discretion in the sentence imposed, which does not shock our judicial conscience. State v. Bolvito, 217 N.J. 221, 228 (2014).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

23