# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1104-24

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

GERALD S. CHAPMAN,
a/k/a STEPHEN CHAPMAN,

    Defendant-Appellant.

_____

        Submitted March 17, 2026 – Decided April 21, 2026

        Before Judges Gilson and Firko.

        On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Indictment No. 23-08-0288.

        Maria D. Noto PC, attorney for appellant (Maria D. Noto, on the brief).

        John P. McDonald, Somerset County Prosecutor, attorney for respondent (Catlin A. Davis, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

This case arises from a May 5, 2023 road rage incident. Defendant Gerald S. Chapman twice fired a handgun at another vehicle operated by Timothy Onwubu (Onwubu or victim) after both vehicles attempted to merge onto Interstate 287 North. Defendant's two infant children were in the backseat of his vehicle at the time.

A jury convicted defendant of five crimes related to that incident: second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1); two counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(2); and third-degree hindering apprehension, N.J.S.A. 2C:29-3(b). The jury acquitted defendant of first-degree attempted murder, N.J.S.A. 2C:5-1(a)(2) to (3) and N.J.S.A. 2C:11-3(a)(1). Defendant was sentenced to five years' imprisonment with forty-two months of parole ineligibility as mandated by the Graves Act, N.J.S.A. 2C:43-6(c). We affirm.

I.

Factual Background

We derive the facts from the evidence presented at trial. On the day of the incident, Onwubu was driving in the right lane on Easton Avenue in Franklin Township in his black Ford Explorer to pick up his wife, Loretta Onwubu, after

2

she underwent surgery at Robert Wood Johnson University Hospital.  While driving, Onwubu noticed another black Ford Explorer driving behind him in the right lane.  Later, defendant was identified as the driver of the second Ford Explorer.  At the time, defendant was driving his eighteen-month-old and four-year-old daughters home from a daycare in Highland Park.

The two vehicles attempted to merge onto I-287, but could not due to heavy traffic, and they remained stuck in the right lane behind other cars also trying to merge.  While waiting in the right lane and still attempting to merge, Onwubu observed defendant become "angry."  Onwubu testified "[t]he guy behind me got mad.  He was really mad."  Defendant yelled at Onwubu "to get out of the way."  Onwubu responded, "I have no place to go.  I[ am] stuck here, just like every other person."

Defendant attempted to pass Onwubu on the right-hand side of the curb but could not because his vehicle did not fit.  At that point, defendant struck Onwubu's passenger-side exterior rear-view mirror with his hand while yelling at him.  Onwubu exited his vehicle to assess the damage and fix his rear-view mirror.  Defendant then maneuvered to the left side of Onwubu's vehicle and twice fired a handgun.  One bullet went through the victim's driver's side window causing it to crack and became lodged in the passenger-side front door.

3

The second bullet went through the rear door on the driver's side and lodged into the interior of the passenger-side door. Onwubu was not hit by the bullets.

Onwubu reentered his vehicle when he saw defendant driving away down Easton Avenue. Onwubu attempted to follow defendant to read his license plate but could not because it had a tinted cover. Eventually, Onwubu lost sight of defendant's vehicle. After driving for a little while "to calm down," Onwubu saw a police officer on the side of the road in a white SUV and advised the officer someone had shot at him. After speaking with the police officer, Onwubu picked up his wife and proceeded to the Franklin Township Police Department (FTPD) to report the incident and give a statement. Ten days later, the FTPD asked Onwubu to return to look through photographs and to extract the bullet from his vehicle.

The FTPD conducted an investigation and discovered defendant's fingerprints on Onwubu's passenger-side rear-view mirror. A bullet was extracted from the interior of Onwubu's vehicle's passenger-side front door. The investigation revealed Onwubu's vehicle had a crack in the front window, damage to the side rear-view mirror, and two bullet holes without exit marks. Through further investigations, FTPD obtained the number for defendant's license plate.

A-1104-24

As part of its investigation, the FTPD searched defendant's Ford Explorer and found a gun holster in the center console, as well as a magnetic gun mount attached to the vehicle below the steering wheel near where the driver's right knee would rest. The investigating officers observed three children's car booster seats in defendant's vehicle and a spent shell casing lodged into one of those seats.

On May 16, 2023, the State applied for two communications data and search warrants (CDW) of defendant's cell phone and communications. The application was supported by an affidavit submitted by Detective Sergeant William Perez of the Somerset County Prosecutor's Office. The trial court granted both CDWs for defendant's cell phone. The CDWs provided that "members of the Somerset County Prosecutor's Office . . . may seize and search the above-captioned cellular telephone facility/device and seize any and all information or file[s] contained therein."

The CDWs also required the communications service providers to provide specific records and information to law enforcement for the period covering May 1 to May 16, 2023. Separately, the CDWs also authorized law enforcement to "seize [and search] any and all information or file[s] contained" in defendant's cellular device. On May 19, 2023, defendant turned himself in to the FTPD with

his former attorney present and was arrested. Detective Sergeant Perez took possession of defendant's cell phone. On August 10, 2023, a Somerset County grand jury returned Indictment No. 23-08-0288. On November 21, 2023, defendant filed a notice of self-defense.

## Pre-Trial Motions

Prior to trial, the State moved to admit evidence extracted from defendant's cell phone, including a photograph of a Glock handgun, S-70, and an Instagram message, S-71. The Glock handgun photograph, S-70, was sent by defendant to a group chat on December 22, 2020. The Instagram message, S-71, was sent by defendant to a gunsmith, Schlosser Gunsmithing Co., on March 29, 2023, inquiring if he could add red dot sights to the two firearms—a Glock-19 and a Smith & Wesson Sigma 40. Defendant's Instagram message stated: "Good afternoon. Do you guys mount red dot si[ghts] on pistols?" Defendant stated he was interested in having red dots mounted on his two pistols. Defendant did not file opposition to the motion.

Following oral argument, the trial court granted the State's motion finding the proffered exhibits contained evidence intrinsic to the crimes charged, and N.J.R.E. 404(b) did not bar their admission. The trial court rejected defendant's argument that the probative value of the exhibits was outweighed by the

6

potential to confuse the jury and would "severely prejudice" him under N.J.R.E. 403. The trial court noted that defendant "concede[d] the probative value" of the proffered evidence.

The Trial

At the four-day jury trial, the State presented Onwubu, his wife, Detective Jeffrey Shaute, Detective Charles Browne, Detective Sergeant Joshua Smith, Detective Bryan Bailey, Detective Sergeant Perez, Detective Thomas Laird, and Sergeant Jeffory Dockery as witnesses. Defendant testified on his own behalf and called his mother, Lillian Chapman, as a witness.

Onwubu testified about the incident and explained defendant yelled at him before striking his passenger-side rear-view mirror and firing two gunshots into his vehicle before defendant sped away. Onwubu also explained the gunshots caused two bullet holes in his vehicle and damage to its windows.

Lillian Onwubu corroborated her husband's testimony by recalling his demeanor when he picked her up from the hospital. She also testified about the damage to their vehicle, shattered glass on the passenger side, and a bullet hole on the driver's side. Lillian Onwubu confirmed there was no bullet hole damage prior to the incident, which was corroborated by photographs and video evidence.

A-1104-24

Detective Shaute testified he is employed by the Firearm Investigation Unit of the New Jersey State Police (NJSP). He searched the firearms licensing system after the incident and determined defendant did not have a permit to purchase or a permit to carry firearms in New Jersey when the shooting occurred.

Detective Browne testified he is employed by the Somerset County Prosecutor's Office as a certified crime scene investigator. He stated that he and Detective Greg Wilson conducted the search of defendant's vehicle and authenticated the photographs and measurements taken incident to the search. Detective Browne testified to his finding bullet holes in Onwubu's vehicle, that the rear-view mirror was pushed outward, and a spent shell casing was found in a child's car booster seat in defendant's vehicle.

Detective Browne testified that the laboratory analysis of the fingerprints found on Onwubu's vehicle matched defendant's fingerprints. Detective Browne explained defendant lived in Kentucky, where he legally owned a gun, had served in the Army for twenty years, and would go to an Army base in New Jersey for range shooting but was not permitted to remove guns from the range to his New Jersey residence. Detective Browne confirmed defendant owned a black Ford Explorer.

A-1104-24

Detective Smith testified he is employed by the NJSP Ballistics Unit in its forensic laboratory. He was qualified as an expert in ballistics. Detective Smith testified that three pieces of ballistic evidence were submitted to the forensic laboratory for testing: a discharged bullet, a discharged shell, and a piece of metal. A database search, which included these parameters, revealed the shell was manufactured by Hornady, and the .38 caliber bullet fragment came from a Glock or a ghost gun manufacturer producing Glock imitation guns. He explained a gun is loud when fired and could sound louder if fired from within a vehicle.

Detective Bailey testified he is employed by the Somerset County Prosecutor's Office in the Crime Scene Investigation Unit. He testified as a latent print fingerprint technician expert and confirmed defendant's fingerprints were found on Onwubu's rear-view mirror.

Detective Sergeant Perez testified he is employed by the Somerset County Prosecutor's Office in the Major Crimes Unit. He searched Easton Avenue for the surveillance footage that captured the incident and the use of license plate readers affixed to traffic poles. A video from SNS Motorsports in Bound Brook showed defendant's black Ford Explorer traveling westbound on Main Street on the day of the incident at 4:53:17 p.m. and Onwubu's vehicle twenty-six seconds

A-1104-24

later. Upon searching for defendant's license plates, Detective Sergeant Perez noticed defendant removed the American flag sticker off his vehicle after the incident, and the bullet holes in Onwubu's vehicle were not present in the videos that captured his license plate prior to the shooting. The State moved two videos from defendant's place of employment and screenshots from the videos into evidence. Detective Sergeant Perez verified the daycare's attendance records for May 5, 2023, were subpoenaed and revealed defendant's two minor children checked in that day at 8:34 a.m. and checked out at 4:31 p.m. and 4:33 p.m.

Sergeant Dockery testified that defendant did not surrender a firearm at the time of his arrest and the search warrant for his residence was never executed because defendant's prior counsel informed him they would not find a gun in the house. Sergeant Dockery explained it was common practice for law enforcement arresting a person relative to a shooting incident to apply for a search warrant of his or her residence when the weapon is missing. The following exchange took place between Sergeant Dockery and the prosecutor at trial:

> [Prosecutor]: Detective, after the defendant turned himself in, did you have a conversation with his attorney?
>
> [Dockery]: Yes.

> [Prosecutor]:  And as a result of that conversation, did you make the decision not to search the defendant's home?
>
> [Dockery]:  Yes.
>
> [Prosecutor]:  Is that your usual practice?
>
> [Dockery]:  No, but I was confident in the information in my conversation with that person.

Detective Laird testified as an expert in the field of mobile device forensics.  He is employed as a detective with the Somerset County Prosecutor's office.  Using information obtained from the CDW, Detective Laird explained he reviewed and extracted relevant communications from defendant's phone.  Further, Detective Laird testified the full extraction was loaded onto a hard drive and moved into evidence as exhibit S-68, while printouts of communications from defendant's cell phone were moved into evidence as exhibits S-69, S-70, S-71, and S-79.  The State also moved defendant's cell phone into evidence as S-63, without objection.

The State attempted to question Detective Laird about S-79, the text messages between defendant and his wife Megan Chapman sent on May 8, 2023, but defense counsel objected, in part, based on the marital privilege, under N.J.R.E. 501(2).  The trial court excused the jury and conducted a hearing on the admissibility of the proffered evidence.  The trial court also addressed the

11

admissibility of S-80 and S-83, which were also text message conversations between defendant and his wife, which the State sought to admit. The State contended the text messages from defendant's cell phone were party admissions. Defendant countered N.J.R.E. 501(2) was inapplicable because his wife was not going to testify. The State maintained that under N.J.R.E. 404(b), the probative value of the proffered evidence outweighed any prejudicial impact.

Defendant objected and argued the risk of prejudice "exceeded" the probative value under N.J.R.E. 403, the marital privilege applied, and the wife's statements constitute hearsay because she was not being called as a witness. The trial court noted that S-79—the May 8, 2023 text messages—addressed defendant's plans to fly to another state to give a presentation from May 16, 2023 to May 19, 2023. The State sought to admit S-79 into evidence to prove defendant's presence in New Jersey until at least May 16, 2023, which the trial court granted.

The trial court ruled S-83—the May 15, 2023 text messages between defendant and his wife—concerned his noticing law enforcement driving around the neighborhood. In the messages, defendant's wife stated, "[s]wear to [G]od, the dude just drove through our neighborhood. Maybe not. But [it looked like the] same all black Explorer with a tiny white dude with brown hair." When

12

defendant asked if she was referring to a detective, defendant's wife responded, "[y]eah[, but] I might just be paranoid." Defendant replied, I[ am] super paranoid with all of [this] as well. . . . The day he stopped by I thought I saw a marked patrol car drive by." The State attempted to admit these messages to prove the hindering charge to show "[defendant] was aware of this investigation [and] had time to get rid of the handgun."

The trial court determined the text messages were inadmissible, unless defendant testified, noting that if defendant did testify, "it[ is] fair game to ask about this." The trial court also advised defendant "that he should have a good conversation with his lawyer about testifying, because these probably would come in if he testifies." In sum, the trial court found all of the text messages were inadmissible but held they would likely be admissible for the purpose of impeachment in the event defendant testified. Accordingly, the trial court withdrew the admission of S-79.

After the State rested, defendant's mother, Lillian Chapman, testified. She stated that her son was "a peaceful person," works in IT for hospitals, and has served in the Army since he graduated college.

Defendant denied shooting at Onwubu's vehicle and testified that he was a "legal and lawful firearms owner." Defendant stated all his guns were "legal

13

and lawful," stored in Kentucky, and he did not have a gun in his vehicle, or in New Jersey, at the time of the incident. Defendant explained he had a concealed carry permit in Kentucky but acknowledged that New Jersey does not have reciprocity with Kentucky. Defendant stated he has four children and his "permanent house" is in Kentucky. Further, defendant testified that he was in New Jersey on the day of the incident because his wife was temporarily working in New Jersey.

Regarding the day of the incident, defendant testified he had just picked two of his children up from day school in Highland Park around 4:30 p.m. in his black Ford Explorer. While waiting to make a right turn onto Easton Avenue at the intersection of Landing Lane and Easton Avenue, defendant testified he observed another black Ford Explorer approaching in the opposite direction during heavy traffic. Defendant claimed this vehicle was driving "dangerously" and weaving in and out of traffic at a high rate of speed, almost colliding with another vehicle. Defendant testified Onwubu pulled off at a "high rate of speed," "cut him off" from the left lane, forcing defendant to "slam on his brakes" and drive onto the curb. Defendant testified the incident made his children in the backseat cry and caused his "work bag" to fall out of the front passenger seat.

14

According to defendant's testimony, he and Onwubu then attempted to merge back into the left lane, but Onwubu honked his horn and swerved his vehicle towards defendant's vehicle. Traffic was "bumper-to-bumper." As a result of Onwubu's "aggressive behavior," defendant stated he "instinctively" hit Onwubu's rear-view mirror "before driving away." At that point, defendant testified Onwubu merged back into the right lane and started following him while "yelling" at him and trying to "swerve into his vehicle." Defendant testified that he continued to drive because he was attempting to get away from Onwubu, who was "chasing" him. Defendant testified Onwubu eventually caught up to him, "blocked" his vehicle, which prevented defendant from moving forward, and then approached his passenger-side door before shattering defendant's mirror.

Defendant denied firing a handgun on the day of the incident and testified that the shell casing found by law enforcement in the back seat of his vehicle came from his previously shooting at a range or at his brother-in-law's farm in Kentucky. Further, defendant testified he did not call the police about the incident because "it did[ not] seem to rise to the occasion of needing law enforcement intervention." Defendant testified he did not bring his firearms

15

from Kentucky to New Jersey and never had a firearm in his vehicle because he "knew" that New Jersey does not have weapons reciprocity with Kentucky.

During defendant's cross-examination, the State re-introduced the text messages for impeachment purposes, which the trial court granted consistent with its prior ruling. The State also introduced S-82, a jail call transcript between defendant and his wife, while he was incarcerated. First, the State presented S-80, text messages conversations between defendant and his wife, where he stated he had a pistol in his office. Defense counsel moved to redact defendant's wife's statements, but the trial court denied the request ruling, "[t]his is something to refute what he just said on cross," and permitted S-80 to be used for impeachment purposes. The trial court admitted the S-80 messages without redacting the wife's statements.

The State then introduced S-83, the May 15, 2023 text messages between defendant and his wife, where he admitted to being "super paranoid" about law enforcement's perceived investigation of him. S-83 was also used to impeach defendant's testimony that he removed the flag sticker from his vehicle to avoid Onwubu recognizing his vehicle in the future and not to avoid detection by the police.

16

The State then introduced S-82, a nine-page transcript of a recorded telephone conversation transcript between defendant and his wife on August 3, 2023, while he was in jail. During the conversation, defendant discussed the incident stating, "the altercation was so insignificant that I had forgotten about it." The State attempted to use this transcript to impeach defendant's trial testimony because in the prosecutor's view, the incident "sounded pretty significant." S-82 contained statements made by defendant's wife, in part, as follows:

> I am going to do everything in my power to make sure that you are not on house arrest here . . . . I have to protect us. . . . [Here is] the problem [defendant]. You have a family that has a history that is not good for my children. . . . They are clearly in danger when they[ are] with you, and I am going to stop that, you are not going to live with . . . us until this is figured out. . . . If you're firing weapons in a car . . . with children . . . then they[ are] in danger with you.
>
> . . . .
>
> You[ are] bullying me into this like you bully me into everything else and I[ am] hearing . . . these stories that . . . people kept away from me about incidents they[ have] had with you, and you being a hothead. I[ am] sick of it. . . . It[ is] time. . . . I[ am going to] protect my family.
>
> . . . .

A-1104-24

[Y]ou just can[ not]t live here and I[ am going to] . . . stop that, I[ am going to] do everything I can to try and stop that so I do[ not] have to move the kids, but I will move the kids.

Defendant testified Onwubu was "trying to hurt [him]" and that he was "worried" because the victim "had been chasing [him]." Ultimately, only one line of S-82 was used by the State to cross-examine defendant, where he said "the altercation was so insignificant that [he] had forgotten about it," and impeach his testimony he was "scared" and "worried" because of the victim's "aggressive" conduct. The trial court admitted S-82 unredacted and instructed the jury that the calls were to be used solely for impeachment purposes and not as evidence of defendant's guilt. The trial court instructed the jury that S-82 "may be considered solely to determine [defendant's] credibility if you believe that it does affect such credibility and not as evidence of his guilt."

Defendant admitted he knew the jail calls were being recorded and acknowledged each call began with a recorded introduction notifying him that he was being monitored. The State introduced this evidence to show defendant was aware that his calls were not confidential because they were being monitored by a third party.

On cross-examination, defendant admitted he owned a nine millimeter gun. The State asked defendant if he ever told anyone that he did not own such

a gun. Defendant answered that while he was in jail, he made such a statement to his father. Upon further questioning about his text messages, defendant testified he has a "pistol" and a "replica pistol" in his office. Defendant also admitted he kept a "weapons cleaning tool" at his New Jersey home. He conceded he owned a Glock 19 and a Smith & Wesson Sigma 40 and wanted to have a red dot mounted to both weapons.

On re-direct, defendant explained his replica gun was "inoperable" because the firing pin was removed. On re-cross, defendant denied that his "paranoia" led him to get rid of the handgun he allegedly used to shoot at Onwubu.

Post-Trial Motions

Following the verdict, defendant filed a motion for a judgment notwithstanding the verdict and two motions for a new trial, which were all denied. Defendant was sentenced and ordered to pay $2,700.10 in restitution to Onwubu for damage to his vehicle. This appeal followed.

Defendant raises the following arguments on appeal:

> I. THE TRIAL COURT ERRED IN ADMITTING PRIVILEGED MARITAL COMMUNICATIONS— ONE OF WHICH WAS ENTERED INTO EVIDENCE WITHOUT PROPER FOUNDATION—WHICH WERE IRRELEVANT, UNDULY PREJUDICIAL, AND CONSTITUTED PROPENSITY EVIDENCE

BARRED BY N.J.R.E. 404(b) THAT ALLOWED THE PROSECUTION TO IMPROPERLY EXPLOIT PERSONAL MARITAL DISCORD, THUS DENYING [DEFENDANT] A FAIR TRIAL.

A. The Marital Communications Privilege Was Violated.

B. The Introduction Into Evidence Of Irrelevant Portions Of Several Exhibits Severely Prejudiced The Defendant And Was Therefore Not Harmless Error.

II. THE [TRIAL] COURT ERRED BY ADMITTING AS INTRINSIC EVIDENCE STATE EXHIBITS S-70, A PHOTOGRAPH OF A GLOCK 19 HANDGUN, AND S-71, MESSAGES FROM [DEFENDANT] TO A GUNSMITH, BECAUSE THEY EXCEEDED THE SCOPE OF THE SEARCH WARRANT, WERE UNDULY PREJUDICIAL, AND CONSTITUTED IMPERMISSIBLE PROPENSITY EVIDENCE.

A. The Exhibits Exceed The Scope Of The Search Warrants.

B. The Exhibits Were Irrelevant Under N.J.R.E. 401 Because They Did Not Relate To Any Fact Of Consequence In The Case.

C. Any Minimal Probative Value From Exhibits S-70 And S-71 Was Substantially Outweighed By The Risk Of Unfair Prejudice Under N.J.R.E. 403.

D. The Evidence Constituted Impermissible Propensity Evidence Barred By N.J.R.E. 404(b).

A-1104-24

E.    The Trial Court's Failure To Engage In Proper Analysis Requires Reversal.

III.    THE ADMISSION OF A HEARSAY STATEMENT BY [DEFENDANT'S] PRIOR ATTORNEY AFTER THE [TRIAL] COURT RULED IT INADMISSIBLE—WHICH OCCURRED ON TWO SEPARATE OCCASIONS—WAS UNDULY PREJUDICIAL, REQUIRING REVERSAL OF THE HINDERING CHARGE.

IV.    THE TRIAL COURT ERRED BY NOT ENTERING A JUDGMENT OF ACQUITTAL AFTER THE JURY'S VERDICT OF GUILTY ON THE TWO COUNTS OF ENDANGERING THE WELFARE OF A CHILD BECAUSE NO REASONABLE JURY COULD HAVE BEEN ABLE TO FIND THAT EACH ELEMENT OF THE OFFENSE WAS MET BEYOND A REASONABLE DOUBT BASED ON THE EVIDENCE PRESENTED.

A.    Insufficient Evidence Of Protracted Harm From Noise.

B.    Lack Of Evidence Regarding Danger From Shell Casing.

V.    THE CUMULATIVE EFFECT OF DEFENSE COUNSEL'S DEFICIENT PERFORMANCE PREJUDICED [DEFENDANT] AND DENIED HIM A FAIR TRIAL, WARRANTING REVERSAL UNDER THE STRICKLAND[1] STANDARD.

A.    The Jury Verdict Would Have Been Different Absent Defense Counsel's Errors At Trial Which Constituted Deficient Performance.

---

[1]  Strickland v. Washington, 466 U.S. 668 (1984).

21

1.	Failure To Object To Evidence That Should Have Been Precluded.

2.	Failure To Seek Curative Measures.

3.	Failure To File Or Argue Motions With Substantive Arguments.

## II.

An appellate court defers to a trial court's evidentiary ruling absent an abuse of discretion. State v. Garcia, 245 N.J. 412, 430 (2021). Appellate courts review the trial court's evidentiary ruling "under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." State v. Prall, 231 N.J. 567, 580 (2018) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). Under that deferential standard, appellate courts "review a trial court's evidentiary ruling only for a 'clear error in judgment.'" State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Scott, 229 N.J. 469, 479 (2017)).

An appellate court "will not substitute [its] judgment unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment.'" Garcia, 245 N.J. at 430 (quoting Medina, 242 N.J. at 412). "A trial court's 'discretion is abused when relevant evidence offered by the defense and necessary for a fair trial is kept from the jury.'" State v. R.Y., 242 N.J. 48, 65

(2020) (quoting State v. Cope, 224 N.J. 530, 554-55 (2016)). However, evidentiary decisions are reviewed de novo if the trial court applies the wrong legal standard in deciding to admit or exclude the evidence. State v. Trinidad, 241 N.J. 425, 448 (2020).

A.

The marital communications privilege, codified in N.J.S.A. 2A:84A-22 and N.J.R.E. 509, provides:

> (1) Except as otherwise provided in this section, no person shall disclose any communication made in confidence between such person and his or her spouse or civil union partner.
>
> (2) There is no privilege:
>
>> (a) if both spouses or partners consent to the disclosure;
>>
>> (b) if the communication is relevant to an issue in an action between the spouses or partners;
>>
>> (c) in a criminal action or proceeding in which either spouse or partner consents to the disclosure;
>>
>> (d) in a criminal action or proceeding coming within section 17 of P.L. 1960, c. 52 (C.2A:84A-17); or
>>
>> (e) in a criminal action or proceeding if the communication relates to an ongoing or future crime or fraud in which the spouses or partners

23

were or are joint participants at the time of the communication.

. . . .

The three criteria that must be met for the marital communications privilege to apply are: (1) there is a communication, (2) the communication is made in confidence, and (3) the communication is between spouses. N.J.S.A. 2A:84A-22. The privilege "stems from the strong public policy of encouraging free and uninhibited communication between spouses, and, consequently, of protecting the sanctity and tranquility of marriage." Bailey, 251 N.J. at 118-19 (quoting State v. Mauti, 208 N.J. 519, 533 (2012)). Absent an applicable exception, "[t]he fact that investigators lawfully obtained the text messages in the course of their investigation does not affect the communications' privileged status." Id. at 128 (citing State v. Terry, 218 N.J. 224, 234-39 (2014)).

In Terry, the Court recognized that the marital privilege is lost, "if a bystander or some other private third party overhears a conversation between spouses, generally, the privilege is lost." 218 N.J. at 229. "The involvement of a third party, in essence, undermines the rule's requirement of confidentiality. Id. at 234. "As a result, if a neighbor overhears a conversation, or a friend reads a letter from one spouse to another, those communications are no longer made

in confidence, and neither spouse can invoke the privilege to prevent disclosure by the third party." Ibid.

Defendant argues the trial court erred in admitting S-82—the nine pages of jailhouse telephone conversations—between he and his wife while he was incarcerated. The State used the transcript to impeach defendant's credibility because he stated, "the altercation was so insignificant that [he] had forgotten about it." The State maintained the incident "sound[ed] pretty significant" when defendant told it to the jury. The State concedes the transcript of jail calls "included marital disagreements that should have been redacted" but did not constitute plain error because the trial court properly instructed the jury to limit consideration of the calls for impeachment purposes only. We need not decide if privilege applied because we hold the admission of the conversation was harmless error.

## B.

Defendant further argues that even if the recorded telephone conversation transcript—S82—was properly admitted for impeachment purposes, the text conversations should have been redacted and limited solely to the portions of the transcript relevant for impeachment. The State agrees, noting the portions detailing "marital discord" should not have been included. However, the State

contends this error is not reversible for three reasons: (1) the trial court instructed the jury that the calls were "not evidence of [defendant's] guilt of the crime[s] charged," but affect his "credibility" and were to be considered solely for that purpose; (2) the State never attempted to use the transcripts to prove defendant committed the crimes charged and it followed the instruction in limiting its use to impeach defendant's credibility; and (3) defendant must prove plain error because his counsel failed to object at trial. In addition, the State asserts it presented overwhelming evidence of defendant's guilt, and the jury returned multiple guilty verdicts on all counts except first-degree attempted murder.

We conclude defendant has failed to demonstrate how not redacting the transcript constituted "harmful error." State v. G.E.P., 243 N.J. 362, 389 (2020). The question for us to consider is "whether in all the circumstances there [is] a reasonable doubt as to whether the error denied a fair trial and a fair decision on the merits." Ibid. (alteration in original) (quoting State v. Mohammed, 226 N.J. 71, 86-87 (2016)). "In such cases, the reviewing court asks whether the error is 'clearly capable of producing an unjust result.'" Mohammed, 226 N.J. at 87 (quoting R. 2:10-2); see also State v. R.B., 183 N.J. 308, 333-34 (2005) ("A

26

defendant is entitled to a fair trial but not a perfect one.") (quoting <u>Lutwak v. United States</u>, 344 U.S. 604, 619 (1953)).

Here, the State presented overwhelming evidence of defendant's guilt. We have assessed the quality of the evidence presented by the State, which included testimony from seven law enforcement officers, Onwubu and his wife, defendant's fingerprints, a shell casing, bullet holes in Onwubu's vehicle, video footage, and documentary evidence. In sum, the admissions of the recorded jail calls and text messages in their entirety were not "clearly capable of producing an unjust result." <u>R.</u> 2:10-2.

## C.

Next, defendant argues the trial court erred in admitting the text messages, S-79, S-80, and S-83, between he and his wife after the incident occurred, which the State used for impeachment purposes. Defendant maintains the State did not demonstrate a "need" to show the jury the complete exhibits. He contends "less intrusive means" should have been used by the trial court, especially in light of the fact that the State only used one line contained in S-82. According to defendant, the text messages were severely prejudicial because they allowed the State to ask "inflammatory, irrelevant, confusing, and prejudicial questions" far beyond the scope of impeachment, such as "[y]ou do[ not] love your wife?"

Defendant argues S-79 was entered without proper foundation, and he was "denied an opportunity to rebut" leading to "the prejudicial conclusions drawn by the jury after reading the exhibit." He contends S-80 about the pistol in his office "confused and misled the jury" and led the jury to "infer" that he had access to a handgun in New Jersey that could have been used to shoot at Onwubu's vehicle. Defendant's arguments are unavailing.

S-83—the May 15, 2023 text message between defendant and his wife—was relevant because as the State points out, it contradicted his testimony that he was the "true victim of the road rage incident," not Onwubu. For example, in S-83, defendant informs his wife the car repair shop sent him a copy of paperwork it received from law enforcement that states he is being investigated for "aggravated assault—shooting!!!" The text message was not unduly prejudicial because it was limited to the road rage incident and was not evidence of any "prior bad acts" contrary to defendant's assertion.

Defendant also argues the text messages should have been redacted to only show the jury the piece of the message relevant for impeachment purposes. On this record, defendant has not demonstrated "a reasonable doubt" that he was denied a fair trial because the text messages and jail calls were not redacted. G.E.P., 243 N.J. at 389.

III.

Defendant next argues the trial court erred in admitting S-70, the photograph of the handgun, and S-71, the Instagram message to the gunsmith, because these exhibits "exceeded the scope of the [CDW], were unduly prejudicial, and constituted impermissible propensity evidence." Defendant contends the trial court disregarded the N.J.R.E. 403 balancing test and improperly applied N.J.R.E. 404(b). For these reasons, defendant asserts this court should review these evidentiary rulings "de novo" rather than for abuse of discretion, citing Trinidad, 241 N.J. at 448.

First, defendant maintains that the exhibits exceeded the scope of the CDW because they exceeded the CDW's specific temporal range. By way of example, defendant contends the photograph was taken in December 2020, and the Instagram message was sent in March 2023, which defendant contends far exceed the CDW's temporal requirements because the search was limited to the contents of his iPhone from "the time period from May 1st, 2023 to May 19th, 2023[,]" and contents from the cellular facilities associated with the phone numbers were limited to "the time period from May 1st, 2023 to May 16th, 2023."

Second, defendant argues the two exhibits are irrelevant and do not satisfy N.J.R.E. 401. Defendant claims "[t]he State failed to demonstrate any connection between the exhibits and the charged offenses."

Third, defendant asserts that the probative value of the exhibits was substantially outweighed by the risk of unfair prejudice because "the exhibits unfairly misled the jury in making [a] speculative connection."

Fourth, defendant argues the exhibits were impermissible propensity evidence barred by N.J.R.E. 404(b), because the exhibits show that he legally owned guns in Kentucky and inquired about modifications, and therefore, he was more likely to have committed the alleged shooting.

Finally, defendant contends the trial court's failure to engage in proper analysis requires reversal.

The State counters that the trial court properly found N.J.R.E. 404(b) did not apply because the two exhibits were intrinsic to the crimes charged and the probative value of the exhibits outweighed the potential prejudice. The State points out that defendant has raised his argument for the first time on appeal, which this court may reject as an untimely motion to suppress.

Our review of the record convinces us the trial court engaged in the proper analyses under N.J.R.E. 401 and N.J.R.E. 404(b). Therefore, our standard of

30

review is abuse of discretion.  We reject defendant's argument that our review should be de novo.

At the motion hearing the trial court found that the evidence of the photograph and Instagram message were "clearly intrinsic and important to the State" because the State was able to extract a bullet from the victim's car, a casing in defendant's car, but could not produce a gun.  Therefore, the exhibits were relevant to the State's case-in-chief that defendant shot the weapon.  Based upon our review of the record, the trial court acted well within its discretion in making these evidentiary rulings.  Garcia, 245 N.J. at 430.

Moreover, the trial court properly denied defendant's N.J.R.E. 403 unduly prejudicial arguments finding that the exhibits do not "invite[] any undue prejudice on . . . defendant."  We note the record demonstrates defendant only argued the two exhibits were unduly prejudicial at the motion hearing.

In this case, defendant's argument that the exhibits were irrelevant and exceeded the scope of the CDW are subject to the plain error standard because he failed to raise these arguments at trial.  R. 2:10-2.  When a party does not object to an alleged trial error or otherwise properly preserve the issue for appeal, it may nonetheless be considered by the appellate court if it meets the plain error standard of Rule 2:10-2.  State v. Singh, 245 N.J. 1, 13 (2021).  "The

31

mere possibility of an unjust result is not enough." State v. Funderburg, 225 N.J. 66, 79 (2016). "In the context of a jury trial, the possibility must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" G.E.P., 243 N.J. at 389 (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).

Defendant's argument that the text messages exceeded the scope of the CDW fails to meet the plain error standard because the State lawfully obtained a joint communication and data warrant of his cell phone. Moreover, defendant's argument that the exhibits were irrelevant fails because the trial court properly determined that the exhibits were intrinsic to the charged crimes and therefore relevant.

Importantly, defendant's argument also fails under the invited-error doctrine because he conceded the exhibits were relevant and had probative value at the motion hearing. "Mistakes at trial are subject to the invited-error doctrine." State v. A.R., 213 N.J. 542, 561 (2013). "Under that settled principle of law, trial errors that 'were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal. . . .'" Ibid. (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)). "In other words, if a party has 'invited' the error, he is barred from raising an objection for the first time on

32

appeal." Ibid. "The doctrine of invited[-]error operates to bar a disappointed litigant from arguing on appeal that an adverse decision below was the product of error, when that party urged the lower court to adopt the proposition now alleged to be error." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 340 (2010) (quoting Brett v. Great Am. Recreation, Inc., 144 N.J. 479, 503 (1996)).

Defense counsel did not object to the exhibits at the motion hearing. In fact, defense counsel conceded the exhibits had probative value. Consequently, defendant has not demonstrated plain error under Rule 2:10-2, or that the invited-error doctrine applies. We conclude the trial court properly permitted the exhibits to be admitted into evidence.

IV.

Defendant contends it was also unduly prejudicial to admit a statement made by his prior attorney after the trial court had previously ruled it was inadmissible hearsay. At sidebar, defendant asserts the prosecutor sought to elicit testimony from Sergeant Dockery that defendant's prior attorney told him "they would never find a gun in the house" and thus his residence was never searched. Defense counsel objected and the trial court sustained the objection on hearsay grounds. Nonetheless, defendant contends the prosecutor ignored

the ruling and "deliberately" questioned Sergeant Dockery about why law enforcement decided not to search defendant's home for the firearm.

At the close of the State's case, defendant claims the prosecutor recalled Sergeant Dockery as a witness and elicited the following testimony from him:

> [Prosecutor]: What did you ask [former defense counsel] about the gun?
>
> [Dockery]: I first asked if it could be surrendered. He told me it could not.

According to defendant, the same objection was raised again and sustained, but the jury had already heard, for the second time, that a gun would not be found in defendant's New Jersey home. Defendant asserts this was impermissible hearsay to bolster the State's theory that he removed a gun he had unlawfully used to shoot at Onwubu, in violation of State v. Spencer, 319 N.J. Super. 284, 304-05 (App. Div. 1999) (holding "if the evidence elicited tends to create an impermissible inference of guilt based upon a statement made by someone other than a witness at the trial it is inadmissible").

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." State v. Brown, 236 N.J. 497, 522 (2019) (citing N.J.R.E. 801(c)). Hearsay may not be admitted into evidence unless it falls within one

of the exceptions provided by the rules of evidence or "other law." N.J.R.E. 802. "[I]f evidence is not offered for the truth of the matter asserted, the evidence is not hearsay and no exception to the hearsay rule is necessary to introduce that evidence at trial." State v. Long, 173 N.J. 138, 152 (2002) (citing State v. Chavies, 345 N.J. Super. 254, 274 (App. Div. 2001)).

Sergeant Dockery's testimony is not inadmissible hearsay because it was not offered to prove the truth of the matter asserted, i.e., that defendant impliedly removed the gun from his home and hindered law enforcement's investigation. Instead, Sergeant Dockery's testimony was admitted for a permissible non-hearsay purpose to explain law enforcement's decision not to pursue a search warrant for defendant's home and the course of the investigation.

Therefore, because Sergeant Dockery's testimony was not hearsay or a violation of defendant's confrontation rights, we discern no ground for reversal. Moreover, defendant fails to show how Sergeant Dockery's testimony was harmful. Willner v. Vertical Realty, Inc., 235 N.J. 65, 79 (2018). We are also satisfied that any perceived error did not produce an unjust result under Rule 2:10-2.

## V.

Next, defendant argues the trial court erred by denying his motion for acquittal on the two counts of endangering the welfare of a child. He contends the State failed to prove he knowingly caused the children harm that would make them abused or neglected. Defendant maintains there was a lack of evidence regarding the shell casing. According to defendant, there was insufficient evidence to support each element of the offense beyond a reasonable doubt other than the State proved the children were under the age of eighteen, and he had a legal duty to care for them.

We apply the same standard the trial court used when deciding a motion for acquittal. State v. Moffa, 42 N.J. 258, 263 (1964). The standard is:

> [W]hether the evidence viewed in its entirety, and giving the State the benefit of all of its favorable testimony and all of the favorable inferences which can reasonably be drawn therefrom, is such that a jury could properly find beyond a reasonable doubt that the defendant was guilty of the crime charged.
>
> [State v. Tindell, 417 N.J. Super. 530, 549 (App. Div. 2011).]

That standard applies regardless of whether the motion was made during trial under Rule 3:18-1, or after the jury returned a verdict under Rule 3:18-2. Id. at 548-49.

Here, defendant filed a motion for judgment of acquittal after the discharge of the jury pursuant to Rule 3:18-2, which provides in pertinent part:

> If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made. . . . The court on such motion may set aside a verdict of guilty and order the entry of a judgment of acquittal and may so order if no verdict has been returned.

"When a defendant moves for a judgment of acquittal after the verdict, [a reviewing court] consider[s] the evidence in its entirety, including the evidence that defendant presented." State v. Lodzinski, 249 N.J. 116, 141 (2021) (first alteration in original) (quoting State v. Lodzinski, 246 N.J. 331, 340 (2021) (Patterson, J., concurring)); see also State v. Fuqua, 234 N.J. 583, 590-91 (2018) (an appellate court "will deny a motion for a judgment of acquittal if the evidence is sufficient to enable a jury to find that the State's charge has been established beyond a reasonable doubt" when the evidence is viewed in its entirety and the State is afforded all favorable inferences that could reasonably be drawn therefrom).

In assessing the sufficiency of the evidence on an acquittal motion, the appellate court applies a de novo standard of review. State v. Cruz-Pena, 243 N.J. 342, 348 (2020). The appellate court "must determine whether, based on the entirety of the evidence and after giving the State the benefit of all its

favorable testimony and all the favorable inferences drawn from that testimony, a reasonable jury could find guilt beyond a reasonable doubt." State v. Williams, 218 N.J. 576, 594 (2014) (citing State v. Reyes, 50 N.J. 454, 458-59 (1967)). Reviewing courts "assess the sufficiency in the record anew, and therefore, owe no deference to the findings of the trial court." State v. Berry, 471 N.J. Super. 76, 99 (App. Div. 2022).

N.J.S.A. 2C:24-4(a)(2) addresses child endangerment and states:

> Any person having a legal duty for the care of a child or who has assumed responsibility for the care of a child who causes the child harm that would make the child an abused or neglected child . . . is guilty of a crime of the second degree.

The State must "prove defendant acted 'knowingly' to convict him of endangering the welfare of a child[.]" State v. Overton, 357 N.J. Super. 387, 393 (App. Div. 2003). Indeed, the trial court instructed the jury:

> To find [defendant] guilty of this crime, the State must prove beyond a reasonable doubt these four elements.
>
> That Jane Doe 1 and 2 were children, that [defendant] knowingly caused the children harm that would make the children abused or neglected, that [defendant] knew that such conduct would cause the children harm and make the children abused and neglected, and four, that [defendant] had a legal duty responsibility for the care of the children.

A person acts knowingly with respect to a result of the conduct if he is aware that it is practically certain that the conduct will cause a result.

Knowingly, with knowledge, or equivalent terms have the same meaning and [the court] already further defined knowledge for you.

Under N.J.S.A. 9:6-8.21, an "[a]bused or neglected child" is a child whose parent or guardian:

(1) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ; (2) creates or allows to be a created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted loss or impairment of the function of any bodily organ; (3) commits or allows to be committed an act of sexual abuse against the child; (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the

aid of the court; (5) or a child who has been willfully abandoned by his parent or guardian, as herein defined; (6) or a child upon whom excessive physical restraint has been used under circumstances which do not indicate that the child's behavior is harmful to himself, others, or property; (7) or a child who is in an institution and (a) has been placed there inappropriately for a continued period of time with the knowledge that the placement has resulted or may continue to result in harm to the child's mental or physical well-being or (b) who has been willfully isolated from ordinary social contact under circumstances which indicate emotional or social deprivation.

The State relied on Onwubu's testimony, defendant's fingerprints found on Onwubu's passenger-side mirror, bullet holes in his vehicle, and Detective Smith's testimony to support the State's position that firing gunshots from a vehicle were "loud enough" to cause hearing damage. The State also presented testimony about law enforcement's discovery of a spent shell casing lodged underneath a child's car seat in defendant's vehicle.

Defendant argues the State failed to prove he knowingly caused the children abuse or neglect because the testimony did not establish how severe the hearing damage could be, and the issue was "left open to question and speculation." He also contends the State's closing argument that a "hot spent shell . . . could have burned the child" was speculative.

40

The trial court reasoned that given the proofs the State presented, and the "contrasting testimony" between defendant and the victim, the jury could find defendant committed the crimes charged beyond a reasonable doubt. The trial court highlighted one of the most "compelling pieces of testimony" was the video from the auto dealership that showed the two black Ford Explorers following each other, the bullet holes in the victim's car, and damage to his passenger-side mirror. The trial court concluded that giving the State the benefit of all its favorable testimony and proofs, a reasonable jury could find defendant committed the crimes he was convicted of beyond a reasonable doubt. The record supports that determination.

## VI.

Finally, we reject defendant's assertion that his trial counsel's performance was constitutionally ineffective under the two-part test detailed in Strickland.[2] Specifically, defendant argues his trial counsel's performance was deficient because he did not adequately prepare for trial, had no strategy, failed to review

---

[2] To establish ineffective assistance of counsel, a convicted defendant must satisfy the two-part test enunciated in Strickland, by demonstrating that: (1) counsel's performance was deficient, and (2) the deficient performance actually prejudiced the accused's defense. Strickland, 466 U.S. at 687. The Strickland test has been adopted for application under our State constitution in New Jersey. State v. Fritz, 105 N.J. 42, 58 (1987).

A-1104-24

exhibits containing privileged marital communications provided to him before trial, failed to object to certain evidence, failed to seek curative measures, and failed to file or argue motions with substantive arguments. Defendant criticizes trial counsel's performance after the jury verdict in submitting a motion for a new trial "devoid" of any substantive arguments and contends the "Strickland standard is met."

We decline to address defendant's post-conviction relief (PCR)-related claims and do so because as a general matter, "ineffective assistance of counsel claims are not entertained on direct appeal 'because such claims involve allegations and evidence that lie outside the trial record.'" State v. Allah, 170 N.J. 269, 285 (2002) (quoting State v. Preciose, 129 N.J. 451, 460 (1992)); see also Mohammed, 226 N.J. at 81 n.5 (declining to address an ineffective-assistance claim raised first on appeal because such was "better suited for review on [PCR]"). "Our courts have expressed a general policy against entertaining ineffective-assistance-of-counsel claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record." Preciose, 129 N.J. at 460 (citations omitted); see also State v. Sparano, 249 N.J. Super. 411, 419 (App. Div. 1991) ("Generally, a claim of ineffective assistance of counsel cannot be raised on direct appeal.").

A-1104-24

The more appropriate forum to raise such claims is in a petition for PCR where an adequate, reviewable record can be developed.  State v. Miller, 216 N.J. 40, 70 n.7 (2013); see also State v. McDonald, 211 N.J. 4, 29-30 (2012). That is particularly true where, as here, the allegations of ineffective assistance appear to implicate strategic decisions of trial counsel that may necessitate an evidentiary hearing.  Furthermore, because defendant raises his ineffective assistance claims for the first time in this appeal, the trial court did not have an opportunity to make findings regarding the Strickland/Fritz test.

To the extent we have not addressed any remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division